564 P.2d 389

**James Robert McREYNOLDS and the Estate of Thelma F. McReynolds, by her Executor, James Robert McReynolds, Appellants,**

**v.**

**Dean SHORT, Individually, Dean Short and Mildred Short, husband and wife, as a community, jointly and severally, Appellees.**

**No. 2 CA–CIV 2213.**

Court of Appeals of Arizona, Division 2.

Jan. 17, 1977.

Rehearing Denied March 14, 1977.

Review Denied April 5, 1977.

Jeffrey W. Hanes and James C. Stephens, Tucson, for appellants.

Wentworth, Wallach & Lundin, by John E. Lundin, Phoenix, for appellees.

## OPINION

HOWARD, Chief Judge.

Appellants, who filed a lawsuit against appellees based upon an unlawful interference with a contractual relationship, appeal from a summary judgment in appellees' favor. We shall first set forth a synopsis of the facts and then discuss them in greater detail as they appear in the depositions which the trial court considered.

In 1973, appellants entered into an option agreement for the purchase of certain real estate near Sonoita, Arizona, with the owners Barnes Parker, Sr., his wife and two sons. Subsequently, Mr. O. H. Gahlberg, a real estate broker acting on behalf of the Parkers, contacted appellee Dean Short in regard to purchasing part of the property which was already under the option agreement. Eventually, Dean Short agreed to buy all the property and on September 10, he executed three contracts of sale, covering all the property, which contained the following clause:

"It is understood and hereby agreed that this agreement is subject to an option given by the seller to a Mr. Robert MacReynolds [sic] and Thelma MacReynolds, [sic] husband and wife and from which option this property must be released and the seller agrees to exercise his best efforts to have said property released."

The three contracts were signed by Barnes Parker, Sr. on September 10, 1973, or the next day. The closing date in the Short-Barnes contracts was September 20, 1973.

On September 17, 1973, McReynolds exercised the option by giving written notice as required in the option agreement. Mr. Gahlberg, when he learned of this, communicated it to Dean Short. Mr. Short called his attorney, Gary Fry, and told him what had happened. He then met with Mr. Fry, showed him his contracts with Barnes Parker, Sr., and after an unsuccessful attempt on the part of Fry to find out whether the Parker-McReynolds option had been validly exercised, Fry filed a lawsuit asking for specific performance of the Short-Parker agreements and filed a notice of lis pendens on the property.

The option and sales agreement entered into by and between the Parkers and McReynolds was in escrow and had not been closed at the time of the filing of the lis pendens. As a result of the lis pendens, the Parkers and McReynolds rescinded the contract which existed between them and executed mutual releases.[1] The earnest

---

1. The court in *Swift v. Beaty*, 39 Tenn.App. 292, 282 S.W.2d 655 (1954), held under similar circumstances, that the rescinding of a contract without reserving the right of action for breach

money which McReynolds had paid to the Parkers was returned to McReynolds. Subsequently, the Parkers' property was sold to Mr. Short pursuant to his contracts and a broker's commission was paid by the Parkers to Gahlberg out of the proceeds of the sale.

The more detailed testimony is as follows. Mr. Gahlberg testified on deposition that he received a listing on the ranch from Barnes Parker, Sr. in 1972. He subsequently contacted Mr. Short who expressed an interest in the property and visually inspected it. In June of 1973 Gahlberg first became aware of the fact that McReynolds had an option to buy the property when he was told by the Parkers of the existence of the option but at the same time was told by Barnes Parker, Sr. that he did not think that McReynolds could secure the money necessary to exercise the option and that Gahlberg should not let it interfere with his negotiations with Mr. Short.

Gahlberg was told some time later, and prior to September 10, 1973, that the McReynolds were in violation of the option because they did not make necessary improvements on the ranch as required by the option and the improvements which were made by them had not been approved by the Parkers as required by their option agreement.

When Gahlberg secured Short's signature on the contracts on September 10, 1973, Short was concerned about the terms in his contract concerning the options. Gahlberg was informed by Barnes Parker, Jr., that there would not be any problem on the option because McReynolds had violated the terms of the option. Gahlberg was also told that the option would not expire until September 19, 1973, but Barnes Parker, Jr. felt confident that they could buy off the McReynolds if necessary. On or about September 20, 1973, Gahlberg went to the Parker ranch to get the Parker-Short closing under way. At that time he was informed

by Barnes Parker, Sr. that they had received word through McReynolds' attorney that the option was going to be exercised. Barnes Parker, Sr. told him that they were going to see what happened. Gahlberg telephoned Short and told him what had happened and that he was unable to get the Parkers to go forward with the closing on the Short-Parker agreement. Short seemed disappointed and told Gahlberg that he believed that he had acted in good faith and had a bona fide contract with Mr. Parker, and he expected Mr. Parker to perform.

The depositions of Barnes Parker, Sr., Barnes Parker, Jr. and David Parker were taken simultaneously. The essence of their testimony was that they never told Gahlberg for *sure* that appellants would not exercise the option and never told him that they would not have any difficulty with the McReynolds because of the fact that McReynolds breached the terms of the option. They also stated that no one told Gahlberg that if McReynolds proffered performance of the option they would refuse because McReynolds had violated the terms of the option. In fact, they stated McReynolds had not violated the terms of the option.

Barnes Parker, Jr. stated that he might have told Gahlberg that if a good offer were made to McReynolds to terminate the option, they might accept.

Barnes Parker, Sr. admitted that on or about September 10, 1973, he told Dean Short that he could then move onto part of the property and use it. He told this to Short because he felt that the McReynolds were not going to exercise the option and Short would ultimately end up with the property.

According to the Parkers, either the same day that the option was exercised or the next day Gahlberg came to the ranch and was told by them that McReynolds had exercised the option.

of contract operates to discharge any claim for inducing a breach of contract. This issue has not been raised by appellees and we need not

discuss it in order to arrive at a disposition of the case.

Barnes Parker, Sr. stated that he was very unhappy with the improvements made by McReynolds under the terms of the option and felt that McReynolds had not lived up to their understanding, and he might have conveyed his feelings to Mr. Gahlberg. He also stated that he was not the owner of all of the property when he executed the contracts with Short on September 10, 1973. He said that he had never told Gahlberg that he was not the owner of all the property but that Gahlberg was aware of that fact.

Dean Short, in his deposition, testified that prior to September 10, 1973, he went to the Parker ranch and while there spoke to Barnes Parker, Sr. who told him that the McReynolds option was terminated because McReynolds had not lived up to the terms of the agreement and that he was not to worry about it. At no time was Mr. Short shown the McReynolds' option. In fact he received a copy of it only when he ultimately closed his sale with the Parkers after the repudiation of the Parker-McReynolds option and sales agreement. Both Gahlberg and Parker, Sr. told him prior to the time he executed the contracts on September 10, 1973, that the McReynolds' option was not in force. When Short signed the contracts on the three parcels, it was his understanding that there was no option but that, according to Gahlberg, Barnes Parker, Sr. insisted that the clause concerning the option be put in the agreements. He was not aware that Barnes Parker, Sr. was not the owner of all of the property.

A day or two before September 20, 1973, he received a call from Mr. Gahlberg who told him that Parker said McReynolds was going to exercise the option. Short's reply to Gahlberg was, "I didn't realize he had an option." Gahlberg mentioned that their deal was in limbo and that he would get in touch with him later. Mr. Short then contacted his son, a lawyer in Phoenix, who in turn asked attorney Fry to call his father. On September 20, 1973, Short spoke with Fry over the telephone. Short told Fry that he had executed three contracts to purchase some property from Barnes Par-

ker, Sr., that there had been some kind of an option from Parker to McReynolds to buy the land and that at the time he signed his agreements with Parker he was assured that McReynolds was out. However, when it came time to close, Parker made an about face. He said he would not sell to Short and that he was going to accept McReynolds' exercise of some option even though McReynolds had not performed the option or complied with its terms. Mr. Short was very upset because he had contracts for the purchase and had been assured that there were no outstanding valid option rights of any kind and that the deal would close in accordance with his terms. Short told him that he wanted to come to the office and talk to him about it.

On September 21, 1973, Short went to Fry's office and brought with him the three Short-Parker purchase contracts which he gave to Fry. He repeated essentially the same facts to Fry that he had given him over the telephone. Mr. Short expressed his amazement over the recent events in view of the assurances he had received from Parker that there had been no compliance with the option and that McReynolds was out, and he asked Fry what he should do about it.

After the conference with Mr. Short, Fry commenced placing a series of phone calls to Nasib Karam, who was Mr. Parker's attorney. His purpose in calling Mr. Karam was to find out who was claiming rights in the property. Since he did not have a copy of the option, he desired to discuss it with Karam and perhaps see the option. As far as he was concerned, he was prepared to drop the matter if it was demonstrated to him that McReynolds had complied with the option.

After the third or fourth phone call, Fry was finally able to speak with Mr. Karam. He found him very uncooperative, unpleasant and almost disdainful. He told Karam that if McReynolds had validly exercised the option they would not pursue the matter but that he had been advised by his client and had information that there had not been compliance with the option terms.

Karam may have told him that the option was good or that it was exercised but when Fry asked if he could see the option, Karam told him that he could not and said "go ahead and sue us." Mr. Fry, being of the opinion from his conversation with Mr. Karam that the Parkers and McReynolds were going to move rapidly to close their deal in order to defeat the rights of Mr. Short, consulted with Short and advised him that a lawsuit should be filed. This was done on September 25, 1973, when a complaint was filed together with the lis pendens. Since they did not know the whereabouts of McReynolds, a copy of the summons and complaint was not served on McReynolds. The complaint was filed rapidly due to the conversation with Mr. Karam and it was not until October 4th that Fry received a preliminary title report showing the exact ownership of all the property.

On October 2, Mr. Fry received a call from McReynolds' attorney. At that time Fry asked him for a copy of the option. Fry told McReynolds' attorney that he wanted to find out what the true story was. McReynolds' attorney was noncommittal and declined to give a copy of the option to Mr. Fry. He informed Fry that McReynolds was willing to sell the property to Short at a higher price. He also stated that McReynolds would close the deal and sell the property to some California people or a person named Peter Wray. The attorney for McReynolds told Mr. Fry, "McReynolds is a whore and will do anything."

Fry had another conversation with McReynolds' attorney over the telephone and offered to drop in at his office with Mr. Short to confer on this matter before the suit was pressed further. Fry wanted to resolve it without having to "go the full route" to a final adjudication. McReynolds' attorney was noncommittal and still declined to reveal the terms of the option. On October 8, 1973, McReynolds' attorney informed Mr. Fry that the Parker-McReynolds option was going to close in the next few days and that the title insurance company had informed Parker that they could not insure "marketable title."

On October 18, 1973, Fry received a telephone call from Mr. Karam demanding that Dean Short close the transaction with the Parkers and stating that if he did not he would be sued. It appeared that in the interim Mr. McReynolds had elected not to go through with his transaction with Parker. Short consummated his transaction with the Parkers and then his lawsuit was dismissed. We now proceed to the law.

■ Summary judgment will not be granted where there is the slightest doubt as to the facts. *City of Phoenix v. Space Data Corporation*, 111 Ariz. 528, 534 P.2d 428 (1975). In reviewing the granting of a motion for summary judgment, the facts must be reviewed in the light most favorable to the opponent. *Riedisser v. Nelson*, 111 Ariz. 542, 534 P.2d 1052 (1975). With this in mind, we turn to the nature of the tort involved here and the defense raised by appellees.

Section 766 of the Restatement of Torts states:

". . . [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another . . . is liable to the other for the harm caused thereby."

Section 773 of the Restatement of Torts states:

"One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by *in good faith* asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of a contract or transaction." (Emphasis added)

It is important to note that the action will not lie for every interference. As is stated in *Hornstein v. Podwitz*, 254 N.Y. 443, 173 N.E. 674, 675 (1930):

"The action is predicated on the intentional interference without justification of contractual rights, with knowledge thereof."

One is privileged to interfere with a contract between others when he does so in the

bona fide exercise of his own rights or when he possesses an equal or superior interest to that of the plaintiffs in the subject matter. *Terry v. Zachry*, 272 S.W.2d 157 (Tex.Civ. App.1954).

■ The law is clear that if two parties have separate contracts with a third party each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract. *Imperial Ice Co. v. Rossier*, 18 Cal.2d 33, 112 P.2d 631 (1941). See also, Illus. 3 to Comment *a* of § 773, Restatement of Torts.

The rule stated in Restatement of Torts § 773 protects the actor only when (1) he has a legally protected interest and (2) in good faith asserts or threatens to protect it and (3) the threat is to protect it by proper means. The rule also applies when the actor honestly believes that he has a legally protected interest. Illustration 1 under Restatement of Torts § 773 states:

> "A enters into a contract to buy Blackacre from B. C *honestly believes* that he has a right-of-way over Blackacre. With knowledge of the contract, he in good faith informs A of his interest and threatens to enforce it by legal proceedings if, as and when the owner of Blackacre should deny his claim. A thereupon refuses to perform his contract with B. C is privileged under the rule stated in this Section." (Emphasis added)

If Short honestly believed that the McReynolds' option was not operative and upon being informed of the exercise of the option then seeks legal advice, gives the facts to his attorney who advises him to file suit and a lis pendens, then we believe the actions of Short would be justified.

■ The only material issue of fact in this case is whether Mr. Short acted in good faith. Appellants contend there is a material factual dispute since the Parkers deny ever telling Gahlberg or Short that appellants would not exercise the option or that the option was no good. We note that Short's testimony relative to what Gahlberg told him remains undisputed. But the issue of Short's credibility is nothing more than a "red herring" under the facts of this case. Barnes Parker, Sr. admitted that after the execution of the Short-Parker contracts he told Short he could start moving some of his property on the land. There is no dispute as to what Short did upon learning of the exercise of the option. He sought legal advice. There is no dispute as to what his attorney did thereafter. A lawsuit was not filed immediately. Instead, the attorney attempted to ascertain from Parker's lawyer whether the option was valid. Even after the suit was filed and before the attempted closing of the Parker-McReynolds contract, Mr. Fry tried to find out from appellants' attorney the terms of the option. Had appellants' attorney shown him the option and had it proved to be valid, he was willing to drop the suit. We cannot see how appellants can claim a wrongful interference and lack of good faith when they actively prevented ascertainment of the truth. The undisputed facts show that Mr. Short acted in good faith in an attempt to protect his property rights.

Affirmed.

HATHAWAY and JACOBSON, JJ., concur.