730 P.2d 204

**William J. SNOW and Eleanor J. Snow, aka Kelly Snow, husband and wife, Plaintiffs-Appellants,**

v.

**WESTERN SAVINGS & LOAN ASSOCIATION; John Does 1–20, Defendants-Appellees.**

**No. CV 86 0088–PR.**

Supreme Court of Arizona, En Banc.

Dec. 10, 1986.

Reconsideration Denied Jan. 27, 1987.

As Amended Jan. 28, 1987.

Ted B. Bowen, Yuma, for plaintiffs-appellants.

Streich, Lang, Weeks & Cardon by Louis A. Stahl, Deana S. Peck, Phoenix, for defendants-appellees.

FELDMAN, Justice.

William J. and Eleanor J. Snow (Snows) petitioned this court to review a court of appeals decision partially affirming a summary judgment in favor of Western Savings & Loan Association (Western). The Snows seek to recover damages from a real estate sale lost in 1982 when Western threatened to invoke its due-on-sale clause

if the Snows transferred mortgaged property without its consent to buyers who would not agree to an increase in interest rates and changes in other loan conditions.

Acknowledging that it is now clear that lenders cannot enforce due-on-sale clauses to exact new loan conditions, the court of appeals held that Western cannot be held liable for damages because in 1982 Western could have believed in good faith that the clause was enforceable in such a manner. *Snow v. Western Savings & Loan Association,* 152 Ariz. 20, 26, 730 P.2d 197, 203 (Ct.App.1985).

We granted review to determine whether Western's assertion of an erroneous, good faith belief that it could enforce this due-on-sale clause completely shields it from contract or tort liability, and whether summary judgment was proper. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and Rule 23(c)(4), Ariz.R.Civ.App.P., 17A A.R.S.

### FACTS

In reviewing the grant of summary judgment for Western, we view the evidence and all reasonable inferences in a light most favorable to the Snows. *See Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau,* 130 Ariz. 523, 527, 637 P.2d 733, 737 (1981).

For purposes of appeal, the facts of this case are undisputed. In 1977, the Snows bought a 13–unit Yuma apartment building as investment property. Pursuant to its mortgage agreement with prior owners, Western consented to the Snows assuming payment of the debt, which was secured by a promissory note and mortgage on the property.[1] As a condition of assuming the obligation, the Snows agreed to abide by the conditions of the mortgage agreement. That agreement contains a "due-on-sale" clause, which permits Western to immediately accelerate the entire loan balance if the Snows sell or transfer the property without its consent.[2]

From 1977 to 1982, the Snows made regular monthly payments. In 1982, the Snows decided to sell the property. Western told the Snows' real-estate broker that it would consent to a sale if the buyers agreed to a one-half of one percent interest rate increase. Based upon this understanding, in February 1982 the Snows accepted a written offer to buy the property from William R. Jewett (Jewett) and William E. Flavin (Flavin). The deal went into escrow. When the Snows sought Western's consent to the sale, however, Western responded by letter that it would consent to the sale if the buyers qualified for a loan, *but only* if the buyers also agreed to pay a three percent increase in the interest rate, a one-time transfer fee of one percent of the outstanding principal balance, and a balloon payment of the remaining principal balance five years from the date of the sale. Western's letter continued:

> In the event the property is transferred without Western Savings' consent or the foregoing conditions are not met, Western Savings will bring legal action in court to protect its rights. Western Savings does not wish to and will not attempt in any way to prevent or interfere with the proposed sale, but we do reserve all our rights and remedies incident to transfer of the property (including our right to accelerate the loan and call it due, collect back interest and attor-

---

1. The Snows also sought damages contending that their agreement to pay an interest rate increase of 1.25 percent in 1977 lacked consideration because they were unaware of the increase. The court of appeals affirmed the trial court's grant of summary judgment in favor of Western on this claim, and we declined to review this issue.

2. The relevant portions of the clause follow: Mortgagor agrees that they will not, nor will they attempt to encumber, sell, transfer, as-sign, convey, lease, or in any other manner dispose of the property herein mortgaged ... without the prior written consent of Mortgagee. Upon default by the Mortgagor in the performance of any one or more of the terms, conditions, agreements, stipulations or covenants contained herein, the entire indebtedness secured hereby shall, at the option of Mortgagee, become immediately due and payable without notice or demand.

neys' fees, etc.).... If Western Savings is successful in litigation, the loan will have to paid [sic] off in full, or at Western Savings' option, the foregoing terms will have to be met....

Thus, Western imposed two separate conditions on Flavin and Jewett: first, that they qualify to assume the loan and, second, that they agree to the changed conditions of loan repayment. If the buyers were unable or unwilling to satisfy both conditions, Western would seek a judicial determination of its power to accelerate.

Once Flavin and Jewett learned of Western's demands, they declined to proceed and did not submit a qualification application; however, Western has never claimed that they were either financially unqualified or irresponsible in any way that would jeopardize its security. During depositions, both Flavin and Jewett testified that they withdrew from their contract to buy the Snows' property because of the required five-year balloon payment on the outstanding balance and the three percent interest rate increase. For purposes of appeal, Western concedes that these conditions caused Flavin and Jewett to cancel the sale contract.

After the sale collapsed, the Snows stopped trying to sell the property because their broker advised them that the property was unmarketable under Western's stated conditions. The Snows then sued Western for damages and for a declaration that Western could not use the due-on-sale clause to change loan conditions. The Snows contend that Western is liable for damages resulting from the lost sale because Western's 1982 attempt to invoke the unenforceable due-on-sale clause to extract more favorable loan payment conditions from the new buyers was illegal. Western, on the other hand, contends that in 1982 it believed that the clause was enforceable as to purchasers of commercial or investment property. In addition, Western contends that it cannot be liable merely for stating that it would seek a judicial declaration of its rights if the Snows transferred the property without its consent.

Without explanation, the trial court granted Western's cross-motion for summary judgment on all counts. The court of appeals affirmed on the damage claim, holding that Western was not liable for the Snows' lost sale because Western in 1982 had a reasonable argument that it was entitled to invoke the due-on-sale clause. 152 Ariz. at 26, 730 P.2d at 203. The court stated that Western's position, though "not based on the firmest possible legal ground," *could* have been maintained in good faith and, therefore, cannot be viewed as "illegal or wrongful." *Id.* The court, however, reversed the grant of summary judgment in favor of Western on the declaratory judgment claim, reasoning that a 1983 case, *Scappaticci v. Southwest Savings & Loan Association*, 135 Ariz. 456, 662 P.2d 131 (1983), clearly established that Western's stated conditions for its consent to sale do amount to an unreasonable restraint on alienation. *Id.* 152 Ariz. at 27, 730 P.2d at 204.

We now consider the following issues:

1. Did Western's attempt to invoke its due-on-sale clause to exact better loan payment conditions from buyers of commercial property illegally restrain alienation?

2. Would a good faith belief in the clause's enforceability shield Western from contract or tort liability?

3. If so, did Western establish a good faith belief in the enforceability of the clause?

4. Was summary judgment on the damage claim properly granted?

## DISCUSSION

### I. THE DUE–ON–SALE CLAUSE

#### A. *Validity and Construction*

Historically, lenders have used due-on-sale or acceleration clauses to protect themselves from unanticipated risks by ensuring that a responsible party continues in possession of the mortgaged property. The clause was invoked to ensure that property was not sold to an irresponsible party who might damage or destroy the

security. *Baltimore Life Insurance Co. v. Harn*, 15 Ariz.App. 78, 81, 486 P.2d 190, 193 (App.1971), *rev. denied*, 108 Ariz. 192, 494 P.2d 1322 (1972); *Holiday Acres No. 3 v. Midwest Federal Savings & Loan Association*, 308 N.W.2d 471, 480 (Minn.1981); Note, *It's Due Time: Federal Preemption of Due-on-Sale Controversies*, 24 ARIZ.L. REV. 371, 371 (1982). Many due-on-sale clauses used in mortgages and deeds of trust are written, as in the Snows' mortgage, in absolute terms: if a mortgagor transfers property without the lender's consent, the lender may accelerate the principal balance due. This type of clause is not a per se illegal restraint on alienation, but Arizona courts will enforce the clause only if the lender pleads and proves reasonable grounds for acceleration. *Patton v. First Federal Savings & Loan Association*, 118 Ariz. 473, 478–79, 578 P.2d 152, 157–58 (1978); *Harn*, 15 Ariz.App. at 81, 486 P.2d at 193. Thus, courts have implied a condition of reasonableness into the clause. The only basis Arizona has recognized as reasonable for accelerating is that, for some reason, the proposed sale or transfer would jeopardize the lender's security. *Patton, supra.*

■ As interest rates began rising in the mid–1960's, lenders started using due-on-sale clauses not only as a means of protecting their security, but also as a tool to keep their loan portfolios at current interest rates.[3] Thus, the lender would consent to a sale only if the purchaser would agree to new loan repayment conditions. *Holiday Acres*, 308 N.W.2d at 481; Sheppard, *The Due-on-Sale Clause in Arizona: When Can it be Enforced?* 20 ARIZ.B.J. 10, 10–14 (June/July 1984); Note, *supra*, 24 ARIZ.L.REV. at 372. Unlike the courts of some states, we have held that a lender's interest in maintaining its loan portfolio at

existing interest rates is not a reasonable ground for invoking the clause. *Scappaticci*, 135 Ariz. at 456, 662 P.2d at 131; *Patton*, 118 Ariz. at 479, 578 P.2d at 158. *But see Occidental Savings & Loan Association v. Venco Partnership*, 206 Neb. 469, 480, 293 N.W.2d 843, 849 (1980) (the due-on-sale clause is an important device to balance portfolio return with cost of money, ensuring survival of lending associations). We agree with the court of appeals that in Arizona the use of the clause to restrict sales to qualified buyers is reasonable, but invocation to change loan terms is not.[4] *Scappaticci, supra; Harn, supra.*

In addition, because Western has not cross-petitioned for review of the court of appeals' holding that it may no longer invoke the clause to change loan terms, that holding has become the law of the case. *Dancing Sunshines Lounge v. Industrial Commission*, 149 Ariz. 480, 482, 720 P.2d 81, 83 (1986).

### B. *Applicability to Commercial Property*

Western contends, however, that in 1982 it reasonably believed that due-on-sale clauses could be used to exact new payment conditions from purchasers of commercial or investment property. This is so, according to Western and the court of appeals, 152 Ariz. at 26, 730 P.2d at 203, because pre-1982 cases involved only residential mortgages or deeds of trust, and good reasons exist for distinguishing between residential and investment or commercial property. *See, e.g., Holiday Acres*, 308 N.W.2d at 484 (lender may use due-on-sale clause to increase interest rates when loan is used to finance investment property).

■ It is true that all of the Arizona cases have either involved residential property or have not disclosed the type of property involved. However, the cases before

---

3. Western submitted an affidavit from a vice-president, Ray Moon, stating that Western was charging between 17 and 19 percent for new commercial loans when it sent the letter to the Snows; the interest rate on the Snows' loan was 9.25 percent.

4. We recognize, of course, that on October 15, 1985, federal law preempted state restrictions on the enforcement of commercial and investment due-on-sale clauses. See A.R.S. § 33–1571 (Supp.1986); *Scappaticci, supra*; Note, *The Garn Act: The Death Knell for Due-on-Sale Controversies in Arizona?* 26 Ariz.L.Rev. 167 (1984); Sheppard, *supra*.

and after 1982, without distinguishing between types of property, have broadly stated that lenders may not use due-on-sale clauses to exact new payment conditions. *See Scappaticci, supra; Patton, supra; Harn, supra.*[5] We agree with the court of appeals, 152 Ariz. at 26, 730 P.2d 203; that the reasoning of these cases applies equally to commercial and investment loans; therefore, Western's attempt to use the due-on-sale clause in the Snows' mortgage to exact new conditions did unreasonably restrain alienation.[6] *Scappaticci, supra; accord Dawn Investment Co. v. Superior Court,* 30 Cal.3d 695, 639 P.2d 974, 180 Cal.Rptr. 332 (1982); *cf. Campbell v. Westdahl,* 148 Ariz. 432, 438, 715 P.2d 288, 294 (App.1985) (landlord's refusal to consent to assignment of commercial lease unless assignees agreed to pay more rent is unreasonable).

## II. WAS SUMMARY JUDGMENT APPROPRIATE?

The Snows' complaint contains a detailed recital of facts, but is fairly vague and conclusory with regard to legal theory. Although the complaint does not use the terms "breach of contract" or "tort," and perhaps fails to formally state the elements of any particular causes of action,[7] Western did not file a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6), Ariz.R. Civ.P., 16 A.R.S. Instead, the pleadings were tested by a motion for summary judgment, which invokes a different standard of trial court review. *Id.,* Rule 56.

Western contends that although the due-on-sale clause clearly may not be used today to exact new payment conditions, no matter what the nature of the property involved, its good faith belief in 1982 that the clause was enforceable against purchasers of commercial property insulates it from liability for damages. Because the trial court did not explain its reasoning in granting summary judgment in Western's favor, we cannot discern whether it considered contract and tort theories independently. It is also not clear whether the court of appeals considered both causes of action. For this reason, we will analyze the potential causes of action separately to determine whether any issues existed that would have precluded granting summary judgment. *Farmers Insurance Co. v. Vagnozzi,* 138 Ariz. 443, 448, 675 P.2d 703, 708 (1983).

### A. *Contract Cause of Action*

#### 1. *Anticipatory Breach*

The mortgage provided that the Snows needed Western's consent before they could sell the apartment building. Western impliedly promised not to withhold its consent unreasonably, and it had no legal right to condition its consent on the buyers' agreeing to more favorable loan conditions. *Scappaticci, supra; Patton, supra.*

Flavin and Jewett never submitted a qualification application once they learned of Western's demands. Western, therefore, has not invoked the due-on-sale acceleration clause and the Snows continue to own the property and to make monthly payments. Had Flavin and Jewett quali-

---

**5.** Although *Harn* does not identify the status of the property involved, the briefs filed in that case show that the property involved a large apartment complex.

**6.** Unlike the clause in *Patton,* the due-on-sale clause in the Snows' mortgage did not expressly give Western the right to invoke the clause to change the payment conditions. *See Silver v. Rochester Savings Bank,* 73 A.D.2d 81, 424 N.Y. S.2d 945 (N.Y.App.Div.1980) (conditioning lender's consent upon purchaser agreeing to new terms constituted an intrinsic breach of the contract).

**7.** The Snows' complaint states that they had entered into a contract with Western, that West-

ern had refused to permit a sale of the mortgaged property unless the buyers agreed to meet the changed loan conditions, and that Western had no legal basis for making these demands. The complaint points out that the mortgage agreement itself does not give Western a right to withhold consent to a transfer unless the buyers agree to changed loan payment conditions. The Snows then allege that as a result of Western's unlawful demands, the intended sale fell through, and that Western "intentionally, knowingly, and with intent to harm" them sought "to leverage and extort" an increase in the interest rate and a shortening of the mortgage term.

fied for transfer, and Western then refused consent or attempted to accelerate the principal balance due, this would have been a routine breach of contract case. "[A] breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." 11 S. WILLISTON, WILLISTON ON CONTRACTS § 1290, at 2 (3d ed. 1968).

■ In this case, however, Western only *threatened* to deny consent or accelerate if its improper conditions were not accepted. Threatening an act that would breach contract obligations is a species of breach known as anticipatory repudiation. *See Diamos v. Hirsch*, 91 Ariz. 304, 372 P.2d 76 (1962). *See generally* 4 A. CORBIN, CORBIN ON CONTRACTS § 973 (1951). For an anticipatory breach to occur, the party allegedly repudiating must positively and unequivocally manifest an intention not to render his or her promised performance. *Diamos*, 91 Ariz. at 307, 372 P.2d at 78; *McMahon v. Fiberglass Fabricators, Inc.*, 17 Ariz.App. 190, 192, 496 P.2d 616, 618 (1972).

■ Western interpreted its due-on-sale clause as giving it the right to demand that Flavin and Jewett agree to the new payment conditions. A party that repudiates its contract obligations on the basis of an alleged "contract interpretation" may be guilty of a form of anticipatory breach. *United California Bank v. Prudential Insurance Co.*, 140 Ariz. 238, 278, 681 P.2d 390, 430 (App.1983).

> If one party to a contract, either willfully or by mistake, demands of the other a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed. Such a repudiation is conditional in character, it is true; but the condition is a performance to which the repudiator has no right. . . .

4 A. CORBIN, *supra* § 973, at 910; *accord* Restatement (Second) of Contracts § 250 comment d, at 274–75 (1981) ("Generally, a party acts at his peril if, insisting on what

he mistakenly believes to be his rights, he refuses to perform his duty."); 11 S. WILLISTON, *supra* § 1323, at 136–38.

Authorities and caselaw distinguish between a defendant's mere, good faith *offer* to perform on terms different than those contained in the contract, and his or her *insistence* upon performing terms not contained in the contract:

> Where the two contracting parties differ as to the interpretation of the contract or as to its legal effects, an offer to perform in accordance with his own interpretation made by one of the parties is not in itself an anticipatory breach. In order to constitute such a breach, the offer must be accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation.

4 A. CORBIN, *supra* § 973, at 911 (cited in *United California Bank*, 140 Ariz. at 279, 681 P.2d at 431); *see also Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.*, 411 F.2d 889, 894–95 (9th Cir. 1969); *W.J. Walker v. Shasta Minerals & Chemical Co.*, 352 F.2d 634, 638 (10th Cir. 1965) (offer to perform made in accordance with promisor's interpretation of the contract, if made in good faith although erroneous, is not such a clear refusal to perform as to constitute an anticipatory breach).

■ The record indicates at least a genuine issue of material fact whether Western was refusing to perform except in accordance with its interpretation of the due-on-sale clause or was merely offering to perform based on its interpretation. A jury certainly could find that Western's letter stated its conditions in positive and unequivocal terms, without leaving room for negotiation, and that the letter clearly informed Flavin and Jewett that they were buying a lawsuit in addition to the property if they failed to consent to the new conditions.

Western argues, however, that it cannot be subjected to damages for having reserved the option of seeking a judicial dec-

laration of its rights under the terms of the contract. We believe this argument mischaracterizes the issue. Western threatened the buyers with acceleration, collection of increased interest after acceleration, attorneys' fees, and, presumably, foreclosure if they did not comply with the new conditions. Reasonable persons could interpret Western's letter as a refusal to perform its obligation to consent to the sale if the buyers were qualified, unless the buyers also agreed to loan modification conditions that Western had no right to exact. The issue of anticipatory breach should not have been taken from the factfinder.[8]

## 2. *Good Faith Defense*

■ Western urges, however, that because it in good faith threatened to invoke the due-on-sale clause, it cannot be liable for breach of contract. Our court of appeals, in addressing precisely this issue, refused to allow a good faith defense to an anticipatory breach of contract claim. *United California Bank*, 140 Ariz. at 279, 681 P.2d at 431. That court stated that the repudiator's state of mind is irrelevant; the adverse effects of a dispute over the meaning of a contract should be borne by the mistaken party, even if acting in good faith. *Id.* To hold otherwise, the court said, would compel adoption of a good faith defense for all claims of breach of contract, fundamentally altering contract law. 140 Ariz. at 279–80, 681 P.2d at 431–32. We agree with the court of appeals' analysis in *United California Bank*. Good faith belief in an erroneous interpretation of one's obligations is not a defense to breach of contract.

On this record, it could not be held as a matter of law that Western had performed its contract obligations. We hold, therefore, that the trial court's grant of summary judgment should be reversed and the case remanded on the contract cause of action.

8. We express no opinion on the outcome of this issue on remand.

## B. *Tort Cause of Action*

## 1. *Intentional Interference with Contractual Relations*

■ Tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with another if the interference causes the plaintiff to lose a right under the contract. W. PROSSER & W. KEETON, LAW OF TORTS § 129, at 978 (5th ed. 1984) (citing Restatement (Second) of Torts [9] § 766 (1979). *See generally* 2 F. HARPER, F. JAMES & O. GRAY, THE LAW OF TORTS §§ 6.5–.12, at 300–55 (2d ed. 1986). To plead a prima facie case of intentional interference with contract, the plaintiff must allege:

(1) the existence of a valid contractual relationship;

(2) knowledge of the relationship on the part of the interferor;

(3) intentional interference inducing or causing a breach;

(4) resultant damage to the party whose relationship has been disrupted; and

(5) that the defendant acted improperly. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 386–88, 710 P.2d 1025, 1041–43 (1985); *Antwerp Diamond Exchange*, 130 Ariz. at 530, 637 P.2d at 740.

■ Elements (1), (2), and (4) exist on the present record without question. The evidence, however, does present a genuine dispute as to whether Western intentionally interfered with the Snows' contract and whether it did so improperly.

The tort is intentional in the sense that Western must have intended to interfere with the Snows' contract or have known that this result was substantially certain to be produced by its conduct. Restatement § 8(A) and § 766 comment j; *accord* 2 F. HARPER, F. JAMES & O. GRAY, *supra* § 6.8, at 321–22. The question of intent ordinarily is for the finder of fact. *Ant-*

9. Hereinafter, Restatement (Second) of Torts will be referred to as Restatement § _____.

*werp Diamond Exchange,* 130 Ariz. at 530, 637 P.2d at 740.

On the state of the record, we believe that a jury could find that Western "intentionally" interfered with the Snows' contract. We assume that Western probably would have preferred the sale to close so it could receive a greater return on the loan. However, even if Western did not desire to interfere, liability attaches to interferences that are "incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." Restatement § 766 comment j. A jury certainly could conclude that Western acted with substantial certainty that its conduct would cause Flavin and Jewett to breach their contract with the Snows. The record contains evidence showing that the apartment building did not generate enough revenue to be marketable under Western's stated conditions. Presumably Western knew the terms of the proposed transaction and was aware, therefore, that the Snows had represented to the buyers that they could assume the loan and purchase the property if they met Western's conditions for financial qualification and agreed to an interest rate increase of one-half of one percent. A jury could conclude that when Western imposed even more onerous conditions, it should have known with substantial certainty that the buyers would either demand some *quid pro quo* from the Snows or threaten to cancel the deal. Although Western may have known facts leading it to believe that the buyers would "stand still" for the new loan conditions, no such facts appear in the record. Thus, on this record, the factfinder could infer that Western acted with knowledge that a necessary consequence of its position would be interference with the contract as it then existed.

## 2. *Privilege*

The final element—whether a defendant has acted improperly—generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded. 2 F. HAR-PER, F. JAMES & O. GRAY, *supra* § 6.12, at 350–51; Restatement § 767 comment b; *H & M Associates v. City of El Centro,* 109 Cal.App.3d 399, 409, 167 Cal.Rptr. 392, 398–99 (1980) (question of justification "comprises a factual issue which should properly be placed before the trier of fact"). To be "improper," an interference must be "wrongful by some measure beyond the fact of the interference itself." *Top Service Body Shop, Inc. v. Allstate Insurance Co.,* 283 Or. 201, 209, 582 P.2d 1365, 1371 (1978), *quoted in* 2 F. HARPER, F. JAMES & O. GRAY, *supra* § 6.6, at 306–07; *see also* Restatement § 767.

"Privilege" as a defense to a business tort is a term eschewed by the Restatement, although adopted by some writers. *See* 2 F. HARPER, F. JAMES & O. GRAY, *supra* § 6.12, at 348–50. The Restatement covers essentially the same ground as "privilege" by imposing a requirement, as an element of the cause of action, that the defendant's interference be "improper." Restatement §§ 766, 767. These are different labels for the same concept. 2 F. HARPER, F. JAMES & O. GRAY, *supra* § 6.12, at 349–50.

Whichever term we use, the question is whether Western's claim that in 1982 it entertained a good faith belief in its right to invoke the due-on-sale clause constitutes a defense as a matter of law to plaintiffs' claim for intentional interference. The rule Western invokes is stated as follows:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Restatement § 773; *accord McReynolds v. Short,* 115 Ariz. 166, 170–71, 564 P.2d 389, 393–94 (App.1977). This rule protects the actor only when (1) he has or honestly believes he has a legally protected interest,

(2) which he in good faith asserts or threatens to protect, and (3) he threatens to protect it by proper means. *McReynolds, supra.*

Here, a Western executive stated in an affidavit that in 1982 Western believed it properly could enforce the Snows' due-on-sale clause. The trial court and court of appeals apparently determined that this belief was reasonable and, therefore, that Western's threats were made in good faith. These courts erred in equating objective reasonableness with good faith. "Good faith" connotes a moral quality or honesty of purpose. *Raab v. Casper*, 51 Cal.App.3d 866, 872–73, 124 Cal.Rptr. 590, 594 (1975); *Doyle v. Gordon*, 158 N.Y.S.2d 248, 259–60 (1954). A determination of good faith involves an inquiry into the party's motive and purpose as well as actual intent. *Phillipe v. Thomas*, 3 Conn.App. 471, 474–75, 489 A.2d 1056, 1059 (1985).

On the facts of this case, we think the trial court could have made no more than a threshold determination of the objective reasonableness of Western's belief in and good faith assertion of its right to accelerate. The judge determines the circumstances under which a privilege may exist, and the jury determines whether the actual circumstances do exist. Restatement § 767 comment *l*. If the court determined that Western's belief in the enforceability of the due-on-sale clause in a commercial context was objectively reasonable, then the question became whether Western subjectively, in good faith, *actually* believed in this position in 1982, an issue of fact which the court should have submitted to the jury. *See McReynolds*, 115 Ariz. at 171, 564 P.2d at 394; *United States Smelting, Refining & Mining Co. v. Wigger*, 684 P.2d 850, 860 (Alaska 1984) (actual motive in interfering with contract is a question of fact); *see also Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (insurer's belief that insured's claim was "fairly debatable" is a question of fact), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). The burden of proving this privilege is on Western. *Chanay v. Chittenden*, 115 Ariz. 32, 37–38, 563 P.2d 287, 292–93 (1977).

To support this privilege, Western cites only two documents in the record to establish its "good faith" belief in 1982. The first is the contents of the April 19, 1982 letter of a Western loan officer in which Western stated that it did not wish to and would not attempt to "prevent or interfere" with the sale, but would accelerate its mortgage, charge back interest, and collect attorneys' fees after the sale if Flavin and Jewett did not comply with the conditions. *Ante* 152 Ariz. at 29, 730 P.2d at 206. We do not believe that such a statement established "good faith" belief in the legality of the clause as a matter of law.

The second document relied upon is the 1983 affidavit filed by Western's vice president which states that in 1982 Western acted in good faith, believing that it had the right to enforce the due-on-sale clause against commercial properties regardless, apparently, of whether its security was in jeopardy. We do not believe the factfinder is bound to accept and follow the conclusions, made after the event, of a corporate officer who had no part in the transaction. Western produced neither contemporaneous documentation of its intention and motives nor contemporaneous record of its 1982 policies regarding application of due-on-sale clauses. If neither type of evidence exists, a jury could consider its absence when determining the credibility of Western's subsequent general protestations of good faith. Western also failed to produce specific evidence of intent from its employees who worked on the Snows' transaction.

■ The present record contains sufficient evidence from which a jury could infer that although the enforceability of the clause was questionable, Western knowingly continued to use it to coerce new conditions from unsophisticated mortgagors. Even were the factfinder to conclude that Western in good faith believed in the validity of its clause, Western would not have an absolute defense unless it also established that it believed that its interest might "be impaired or destroyed by the performance of the contract." Restatement § 773; *McReynolds, supra.*

Accordingly, we conclude that the trial court erred by finding as a matter of law that Western threatened legal action in good faith; therefore, summary judgment must be reversed and the case remanded for trial on the tort issue.

## CONCLUSION

We vacate the court of appeals' affirmance of the trial court's grant of summary judgment in favor of Western on the damage issue for two reasons. First, whether Western committed an anticipatory breach of contract by refusing to perform except in accordance with its interpretation of the due-on-sale clause is a question of fact and good faith is not a contract defense. Second, on the tort cause of action, a jury must consider whether Western intentionally and improperly interfered with the Snows' contract to sell their property. We approve the remainder of the court of appeals' opinion. This case is remanded to the trial court for further proceedings consistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.