**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARIA BRANDON,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>MARICOPA COUNTY; SANDRA WILSON; ROCKY ARMFIELD; PAUL WILSON; CHRIS ARMFIELD,<br>*Defendants-Appellants.* | No. 14-16910<br><br>D.C. Nos.<br>2:12-cv-00788-FJM<br>2:13-cv-01148-FJM<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, Senior District Judge, Presiding

Argued and Submitted October 20, 2016
San Francisco, California

Filed February 23, 2017

Before: Carlos T. Bea and Sandra S. Ikuta, Circuit Judges,
and Jane A. Restani,* International Trade Judge.

Opinion by Judge Bea

---

* The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's judgment in favor of plaintiff following jury verdicts and vacated the attorneys' fee award in plaintiff's action brought under 42 U.S.C. § 1983 and state law alleging she was fired from the Maricopa County Attorney's Office in retaliation for a statement she made to a local newspaper regarding a case she handled for the Maricopa County Sheriff's Department.

The panel held that no reasonable jury could conclude that County risk management officials improperly interfered with plaintiff's employment contract when they requested reassignment of her risk management cases to other lawyers after she made statements to the newspaper. Accordingly, the panel reversed the jury's verdict against the defendant officials on the state law tortious interference with contract claim because, as a matter of law, defendants' conduct was not improper.

The panel held that with the legally defined scope of an attorney's duties in mind, it was obvious that plaintiff's comments to the newspaper could not constitute constitutionally protected citizen speech under the principles from *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074–76 (9th Cir. 2013). Accordingly, the panel reversed the jury's First Amendment retaliation verdict.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Because the panel remanded for the district court to enter judgment for defendants, there were no successful claims that could serve as the basis for a fee award. As such, the panel held that the district court's fee award must be vacated.

## COUNSEL

Kimberly A. Demarchi (argued) and Jared L. Sutton, Lewis Roca Rothgerber LLP, Phoenix, Arizona; Michele M. Iafrate, Iafrate & Associates, Phoenix, Arizona; for Defendants-Appellants.

Larry J. Cohen (argued), Cohen Law Firm, Phoenix, Arizona, for Plaintiff-Appellee.

## OPINION

BEA, Circuit Judge:

Appellee Maria Brandon worked for many years as a civil litigation attorney for the Maricopa County Attorney's Office (MCAO), and later (briefly) as a direct employee of Maricopa County, defending the county and related entities in civil lawsuits, before again returning to her previous employment at the MCAO. During her time as a direct employee of the county she received a call at her office from a newspaper reporter inquiring about a case she was handling for the Maricopa County Sheriff's Department. One of her comments to the reporter about the case was later published in an article in that newspaper. This article suggested that the county substantially increased settlement offers to avoid having key county officials testify.

After Brandon returned to the MCAO, county officials responsible for overseeing risk management and civil lawsuits against the county thought her conduct in talking about the case mentioned was unprofessional for a lawyer representing the county. In light of what they considered were justifiable misgivings regarding Brandon's judgment, these officials requested that Brandon not be assigned further cases in which the county was a party and which involved risk management. Brandon was later terminated from employment with the MCAO. She filed a lawsuit against the county and certain county officials. A jury found for Brandon and against Maricopa County on her claim that she had been fired in retaliation for her exercise of First Amendment rights in speaking to the newspaper reporter, and against certain county officials for state-law based tortious interference with her employment contract. The district court entered judgment on the basis of the jury's verdicts.

We reverse.

I.

Maria Brandon, Appellee-Plaintiff, was employed by the MCAO for several decades as a civil litigation attorney. She left the MCAO in 2009 to take a job with the "Special Litigation" department formed by Maricopa County to substitute for the MCAO in certain civil lawsuits. While at Special Litigation and still representing Maricopa County as an attorney, Brandon spoke to an *Arizona Republic* reporter who called her office line to elicit comment on the county's settlement of a lawsuit, which claimed sheriff department brutality towards protestors, in which Brandon was an attorney of record. The newspaper reporter called Brandon because a confidential memo Brandon had written was leaked

by person(s) other than Brandon. Brandon expressly authorized the newspaper to publish her spoken comments but refrained from commenting directly on the memo. The newspaper article suggested that the county made an overly generous settlement offer to prevent embarrassing certain county officials who might have been required to answer questions in depositions. On this issue, the newspaper related that Brandon said: "I don't know why they did what they did, and I'm sure they have their reasons."

Special Litigation was later disbanded after the Arizona courts ruled that the county did not have statutory authority to reassign commonplace legal work outside the MCAO. Brandon was then rehired in 2011 by the MCAO with a contract that included a probationary period. During the probationary period, her employment was terminated ostensibly because of an altercation she had with another staff member.

After being fired, Brandon filed a lawsuit against Maricopa County and various county officials for multiple claims related to her termination. The case was narrowed to four claims eventually tried to a jury: 1) that Maricopa County and her MCAO supervisor had retaliated against her for exercising her First Amendment rights, by talking to the newspaper reporter, in violation of 42 U.S.C. § 1983; 2) that the County and her supervisors violated her due process rights in violation of 42 U.S.C. § 1983 by terminating her without following proper procedures; 3) that the County had wrongfully terminated her employment under state law; and 4) that County risk management officials, Sandra Wilson and Rocky Armfield, had tortiously interfered with her employment contract by asking the MCAO to reassign her cases to another lawyer.

Following a seven day trial, the jury returned a verdict in favor of Brandon against Maricopa County on her claim of violation of her First Amendment rights in connection with the newspaper interview and awarded nominal damages of $1. The jury also returned a verdict in favor of Brandon against defendants Armfield and Wilson for tortious interference with her employment contract and awarded damages of $638,147.94. The jury found for defendants on Brandon's due process and wrongful termination claims, which claims are not at issue in this appeal. Defendants later filed a motion for judgment as a matter of law or, alternatively, for a new trial, as to the First Amendment and contract interference claims, which the district court denied. The district court subsequently awarded $302,175.28 to the plaintiff for attorney fees under 42 U.S.C. § 1988(b) as the prevailing party on the First Amendment claim, a 42 U.S.C. § 1983 claim.

On appeal Appellants first argue that, as a matter of law, the jury wrongfully imposed liability for the tortious interference with contract claim, for their conduct did not create legal liability under Arizona tort law. Appellants next argue that Brandon's speech to the newspaper was, again as a matter of law, made pursuant to her official duties and, therefore, not protected by the First Amendment from discipline, such that any adverse employment actions taken against Brandon by her employer because of the newspaper interview do not give rise to any legal liability under 42 U.S.C. § 1983. Appellants seek reversal on both claims.

II.

Under Arizona tort law, a necessary element of tortious interference with contract is that such interference be

"improper."[1]  *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 388 (1985) (superseded by statute on other grounds).  Impropriety "generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded." *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 34 (1987).  The Arizona Supreme Court has recognized that an action is not "improper" when an alleged interferer "(1) . . . has or honestly believes he has a legally protected interest, (2) which he in good faith asserts or threatens to protect, and (3) he threatens to protect it by proper means." *Id*. at 34–35 (discussing Restatement (Second) of Torts § 773[2]).  Earlier Arizona case law also cited in *Snow* explained: "One is privileged to interfere with a contract between others when he does so in the bona fide exercise of his own rights or when he possesses an equal or superior interest to that of the plaintiffs in the subject matter." *McReynolds v. Short*, 115 Ariz. 166, 170–71 (App. 1977).

---

[1] The Arizona Supreme Court incorporated seven factors from the Second Restatement of Torts § 767 to guide the analysis of the impropriety of an action: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Wagenseller*, 147 Ariz. at 387.

[2] Restatement (Second) of Torts § 773 states: "One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."

This doctrine placing a limit on what is "improper" makes good practical sense. Individuals (such as county representatives Wilson and Armfield) who have a legitimate interest in the performance of a contract between two third parties (such as the employment contract between Brandon and the MCAO entered into to provide legal services to their employer, the county) should not face potential tort liability for concerning themselves with the performance of that contract. In a word, certain county employees have a legitimate interest in who is a lawyer for their agency.

The communications of a client (the county, as represented by Wilson and Armfield) speaking to its attorney (the MCAO) requesting specific legal personnel be removed from certain county matters fits the situation contemplated by *Snow* and *McReynolds*. The district court, however, rejected Appellants' argument on this point by finding that Maricopa County's risk management office (where Wilson and Armfield worked) was "not the 'client' for purposes of this analysis." This conclusion is factually incorrect because the record is undisputed that the risk management office coordinated, on behalf of the county, with the MCAO to manage the resolution of civil lawsuits against the county. The record establishes that the County was acting through its risk management office and personnel in its interactions with the MCAO.[3] No reasonable jury could find otherwise from the record here.

---

[3] Indeed even Appellee-Plaintiff's counsel during trial referred to Wilson and Armfield as the county's representatives to the MCAO: ". . . the representative of the County, including the Board of Supervisors, and high-level person in County government Sandi Wilson and the head of Risk Management Rocky Armfield all don't want you working on these Risk Management cases?"

As such, risk management officials Wilson and Armfield had a legally protected interest[4] in ensuring the MCAO provided quality legal services to the county. Wilson and Armfield requested reassignment of risk management cases because Brandon publicly commented on a sensitive and ongoing county legal matter in a manner they reasonably perceived as unprofessional and betraying her duty of loyalty. On this record, requesting that MCAO supervisors remove from certain cases one of their lawyers reasonably perceived as a liability to the county certainly cannot be considered an improper means for protecting the county's legitimate legal interests, even if Wilson and Armfield did not have statutory authority to fire Brandon. Under *Snow* and *McReynolds*, no reasonable jury could conclude that Wilson and Armfield "improperly" interfered with Brandon's employment contract (made for the express purpose of serving the county's legal needs) when they requested reassignment of risk management cases to other MCAO lawyers. Arizona law's respect for a client's broad discretion in the selection of a legal representative of his or her own choosing further undergirds the propriety of Wilson and Armfield's actions. ARIZ. SUP. CT. 42, ER 1.16 cmt. 4 ("A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services"); *State Farm Mut. Ins. Co. v. St. Joseph's Hosp.*, 107 Ariz. 498, 501 (1971) ("[T]he law in Arizona is clear that a client has the absolute right to

---

[4] Subsequent Arizona case law explained: "An interest is 'legally protected' within the meaning of Restatement § 773 if society recognizes the interest as so legitimate that everyone is under a duty not to invade it by interfering with its realization, and those who do so would be civilly liable to the possessor." *Strojnik v. Gen. Ins. Co. of Am.*, 201 Ariz. 430, 434 (App. 2001). The relationship between a county and its legal counsel would certainly seem to satisfy this definition.

terminate the attorney-client relationship at any time, with or without cause").

No reasonable jury could conclude on this record that the county's risk management office was "not the 'client.'" The tortious interference with contract judgment entered upon the jury's verdict against defendants Wilson and Armfield is thus reversed because, as a matter of law, their conduct was not improper.

III.

Speech made by public employees in their official capacity is not insulated from employer discipline by the First Amendment but speech made in their private capacity as a citizen is. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). The Supreme Court has explained that neither an employee's job description nor the location or content of the allegedly protected speech dispositively determines whether an employee was speaking as a citizen. *Id*. at 420–25. Rather, the Supreme Court emphasized that:

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within

the scope of the employee's professional duties for First Amendment purposes.

*Id*. at 424–25. Later interpreting the *Garcetti* case, the Ninth Circuit affirmed that generally "the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008) (dispute over whether a school security guard's duties related to student discipline extended to internal communications on security policies). *See also Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009) ("the question of the scope and content of a plaintiff's job responsibilities is a question of fact") (internal quotation marks and citation omitted). Yet in synthesizing relevant Ninth Circuit precedent since *Garcetti*, an en banc panel of this Court in *Dahlia v. Rodriguez,* 735 F.3d 1060, 1074–76 (9th Cir. 2013), announced three guiding principles for undertaking the practical factual inquiry of whether an employee's speech is insulated from employer discipline under the First Amendment. *Dahlia* involved a First Amendment retaliation suit brought by a police detective for being placed on leave after reporting beatings and serious physical abuse of certain arrested individuals by other members of the Burbank Police Department. *Id*. at 1063–64. The guiding principles are:

1. "First, particularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties. When a public employee communicates with individuals or entities outside of his chain of

command, it is unlikely that he is speaking pursuant to his duties." *Id*. at 1074 (internal citations omitted).

2.  "Second, the subject matter of the communication is also of course highly relevant to the ultimate determination whether the speech is protected by the First Amendment. . . When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties. . . By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct." *Id*. at 1074–75 (internal citations omitted).

3.  "Third, we conclude that when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties. Indeed, the fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties notwithstanding any suggestions to the contrary in the employee's formal job description." *Id*. at 1075 (internal citations omitted).

The *Dahlia* court went on to apply these principles to find that the record showed that Dahlia's statements disclosing police brutality raised triable issues of fact as to whether the statements were "protected by the First Amendment." *Id*. at 1078.

With this legal standard in mind, we now turn to Appellants' argument on appeal. Appellants claim that Brandon's comment quoted by the *Arizona Republic* was made in her official capacity and thus not protected by the First Amendment for three reasons: 1) the comment involved a case she worked on as a county employee, 2) the comment discussed her work product, and 3) the comment was made on her county office phone in response to a call during normal business hours.[5] The Appellants conclude from this that "the only reasonable conclusion that can be drawn is that Ms. Brandon commented to the press about one of her cases in her capacity as an attorney for the County," such that her speech would not be citizen speech constitutionally protected under the First Amendment.

The district court rejected this same reasoning explaining that "[t]he key inquiry in determining whether speech is public or private is whether the speech was made pursuant to the employee's official duties." *Garcetti*, 547 U.S. at 421. The district court emphasized that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech" and, in fact, public employees speaking out based on information they learned in their employment "holds special value." *Lane v. Franks*, 134 S.Ct 2369, 2379 (2014). The district court accepted that the county's "authority to discipline its employees for improper or harmful comments to the press" could bar

---

[5] The content of Brandon's confidential memoranda to her client (leaked to the press by someone other than Brandon) obviously could not constitute citizen speech protected by the First Amendment as these memoranda were attorney work product that Brandon generated to aid her client in settling potential legal claims.

Brandon's First Amendment retaliation claim, but found that the defendants provided no evidence to show that Brandon's statement violated any policy, contained confidential information, harmed the county, or interfered with her duties so as to outweigh her First Amendment protections. *Connick v. Myers*, 461 U.S. 138, 150–51 (1983). As such, the district court concluded that "Brandon's speech was entitled to First Amendment protection" and declined to overturn the jury's conclusion that Brandon was speaking as a citizen.

The error in the district court's conclusion stemmed from its failure to undertake the "practical inquiry" required by *Garcetti*. Under Arizona law, as an attorney for the county Brandon had a broad fiduciary duty to her client – the county. *In re Zang*, 166 Ariz. 426, 430 (1990) (the "fiduciary duty to a client [is] the most important ethical duty a lawyer owes"). *See also* Restatement (Third) of the Law Governing Lawyers § 16 ("To the extent consistent with the lawyer's other legal duties and subject to the other provisions of this Restatement, a lawyer must, in matters within the *scope of the representation*: (1) proceed in a manner reasonably calculated *to advance a client's lawful objectives*, as defined by the client after consultation; (2) act with reasonable competence and diligence; (3) *comply with obligations concerning the client's confidences* and property, avoid impermissible conflicting interests, deal honestly with the client, and not employ advantages arising from the client-lawyer relationship in a manner adverse to the client; and (4) fulfill valid contractual obligations to the client.") (emphasis added). The scope of this fiduciary duty of loyalty extends broadly. *Matter of Evans*, 113 Ariz. 458, 462 (1976) ("An attorney's loyalty to his client is not just a casual obligation to be turned on or off as the dictates of the moment indicate or particular employment may demand."); *see also In re Piatt*, 191 Ariz.

24, 26 (1997) ("A lawyer is a fiduciary with a duty of loyalty, care, and obedience to the client. The relationship is, and must be, one of utmost trust."). Moreover, Arizona's rules of professional conduct for lawyers anticipate public statements made to media outlets to be part of an attorney's duties representing a client. *See* ARIZ. SUP. CT. 42, ER 3.6(a); *cf. Cox Ariz. Publ'ns, Inc. v. Collins*, 175 Ariz. 11, 14–15 (1993) (noting that Arizona's rules of Professional Conduct for attorneys permit certain, but not all, interactions with the media relating to pending cases).

With the legally defined scope of an attorney's duties in mind, it becomes obvious that Brandon's comments to the newspaper could not constitute constitutionally protected citizen speech under the principles from *Dahlia*. First, while Brandon was not speaking within her chain of command, she was inevitably speaking as a lawyer representing the county as her public statements touched on the very matter on which she represented the county. Second, unlike in *Dahlia*, Brandon did not bring up any allegation of corruption or other serious misconduct in her statement to the newspaper, she merely suggested that she disagreed with the settlement figures authorized by the county's representatives. While the newspaper article suggested the county paid too much to protect certain employees from public criticism, Brandon's published statement made no such allegation but merely reflected negatively on her client. That the attorney who handled the case did not "know why [the client] did what they did" implies the client was acting without professional advice when paying the settlement. Brandon's statement that they must "have their reasons" cements the implication that the client was acting unprofessionally. Indeed, if Brandon alleged any sort of misconduct this would be a different case. Third, as was expressly recognized by various witnesses at

trial, Brandon's statements to the *Arizona Republic* did not violate any MCAO policy, to the extent applicable, or County policy, which according to *Dahlia* is relevant to the analysis of whether Brandon's speech was made in an official capacity 735 F.3d at 1075. Taken together, the only possible outcome of the "practical inquiry" required by *Garcetti* was that Brandon's speech to the *Arizona Republic* fell under the broad set of official duties she owed Maricopa County as its attorney, and so was not constitutionally protected citizen speech. Unlike the police detective's statements at issue in *Dahlia*, Brandon's official speech could not be relegated only to certain times or places but, given the fiduciary duties imposed by her role as an attorney for the county, extended to what she said about matters relating to her representation of Maricopa County. For these reasons, the First Amendment retaliation verdict must be also reversed.

IV.

Because we remand for the district court to enter judgment for Appellants, there are no successful claims that could serve as the basis for a fee award. As such, the district court's fee award must be vacated.

**REVERSED.**