RAN CORPORATION, Appellant,

v.

David HUDESMAN and H. Martin Smith, Jr., Appellees.

No. S–3639.

Supreme Court of Alaska.

Dec. 27, 1991.

,

William G. Ruddy, Ruddy, Bradley & Kolkhorst, Juneau, for appellant.

Joan Travostino, Preston, Thorgrimson, Shidler, Gates & Ellis, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

RAN Corporation contracted with a lessee for the assignment of a lease, conditional on the approval of the lessor. David Hudesman, the lessor, refused to consent to the assignment because Hudesman had identified another tenant who offered greater economic benefit. RAN sued, alleging, *inter alia*, intentional interference with contractual relations and intentional interference with prospective economic advantage. The superior court found that RAN had not established a prima facie case for either tort, and that, in any event, Hudesman was privileged to interfere with the assignment contract because he acted to protect his direct financial interest.

We find that the trial court correctly ruled that Hudesman was privileged, as a matter of law, to intentionally interfere with the proposed assignment of the lease of his property.

## I.

For many years the Red Dog Saloon, a combination bar and gift shop, occupied the premises at 159 South Franklin Street in Juneau. David Hudesman owned the property. It was leased to Don Harris, the Saloon's owner and operator.[1] In the lease, Hudesman retained the right to approve any assignment. Section 10(a) of the lease agreement provided that

> lessees shall not assign this lease or any interest therein, and shall not sublet the said premises ... without the written consent of lessor ..., but such consent shall not be withheld unreasonably, it being understood that the lessees have a right to any assignee or subtenant who is financially responsible and who will properly care for the premises. Lessor may require that adequate security be furnished to him as a condition to such consent....

Harris decided to move his business. He intended to relinquish all interest in the property at 159 South Franklin by assigning the lease, which still had some four years left on its term.

Richard Stone, President of both R.D. Stone, Inc., and, later, the RAN Corporation (RAN), contacted Harris after reading about the planned relocation and expressed his interest in leasing the premises. Stone, an operator of Alaskan artifacts galleries in Ketchikan, wanted to open an artifacts gallery in Juneau.

Initial negotiations occurred in September 1987. Harris told Stone that he would assign the lease for $15,000. He explained that Hudesman retained the right to approve of the assignment and Stone would be required to submit documentation describing RAN's financial status and proposed use of the premises. Stone delivered a check for $15,000 along with all requested documents.

Harris contacted Hudesman's agent, H. Martin Smith, Jr., about the potential assignment. Smith directed Harris to send Stone's prospectus material to Smith "on behalf of Mr. Hudesman," which Harris did.

Around the time Harris and Stone were negotiating, Jerry Reinwand contacted Hudesman about the property at 159 South Franklin. Reinwand, a long-time resident of Juneau, had served in a variety of high-level government positions and as a lobbyist, and Hudesman hoped to use Reinwand's influence in the capital to further his business interests. Specifically, Hudesman wanted Reinwand's help in securing government leases for a large building Hudesman owned in Juneau. Reinwand agreed to help. In return, Hudesman promised that if Don Harris moved the Red Dog Saloon out of 159 South Franklin, Reinwand could move in.

In early January 1988, Smith told Harris that Hudesman refused to consent to the assignment of the lease to RAN. Smith warned Harris that if he persisted in "pushing" RAN as a prospective assignee, Harris "would be looking at litigation" because "Mr. Hudesman wanted Mr. Reinwand in there."

Harris complied with Smith's demand to deal with Reinwand. On February 5, Harris returned Stone's $15,000 deposit and formally notified him in writing of Hudesman's rejection. Harris' letter enclosed a copy of a letter, dated February 2, 1988, that Harris had received from Smith in which Smith explained:

> Mr. Hudesman does not approve your assigning your lease, or subletting, to a business different than what is called for in your lease. Instead, he prefers that the premises be taken over by his friend, Mr. Jerry Reinwand, as a home for his various business activities. Mr. Hudesman will approve an assignment of your leasehold rights to Mr. Reinwand, provided your decision to vacate is final.

By March, Harris had assigned his lease to Reinwand, who paid Harris $15,000 and took possession of the premises.

RAN filed suit for an injunction to invalidate Reinwand's lease and to enforce the assignment contract that RAN had with

---

1. Hudesman had leased the property to Don's brother Perry. In late 1986, Perry Harris transferred ownership and control of the Red Dog to his brother Don.

Harris. RAN also sought damages, naming Smith, Hudesman, Reinwand, Don Harris, and Perry Harris as defendants. The superior court denied RAN injunctive relief; RAN pursued its damage claims. After a year of litigation, RAN settled with Reinwand and entered into a stipulation of dismissal with Don and Perry Harris. RAN's only remaining claims were against Hudesman and Smith for negligent interference with contract or prospective economic advantage, intentional interference with contractual relations, and intentional interference with prospective economic advantage. All parties moved for summary judgment. The superior court granted the summary judgment motions of Smith and Hudesman. RAN has appealed these rulings on its intentional tort claims only.

## II.

■ The elements of the tort of intentional interference with contractual relations are:

[P]roof that (1) a contract existed, (2) the defendant ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified.

*Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986). The fourth, fifth, and sixth elements also apply

to the related tort of intentional interference with prospective economic advantage. *Oaksmith v. Brusich*, 774 P.2d 191, 198 (Alaska 1989). As our analysis in this case is equally applicable to either tort, we will refer to them collectively in this opinion.

The sixth element of the intentional interference tort, that the interferer's conduct not be privileged, is troublingly vague. The RESTATEMENT (SECOND) OF TORTS § 767 (1965) speaks not in terms of "privilege," but requires that the actor's conduct not be "improper." Other authorities use the catch word "malice." *Prosser and Keeton on Torts* § 129 at 983 (W. Keeton 5th ed. 1984) (hereinafter *Prosser*). Regardless of the phrase that is used, the critical question is what conduct is not "privileged" or "improper" or "malicious." The RESTATEMENT § 767 lists seven factors for consideration,[2] and while these factors are relevant in some or all of the incarnations of the interference tort, they are hard to apply in any sort of predictive way.[3]

■ We recognized this fact in *Bendix Corp. v. Adams*, 610 P.2d 24, 30 (Alaska 1980). Instead of relying on the RESTATEMENT factors, we adopted a test of privilege based on a number of cases which hold that where an actor has a direct financial interest, he is privileged to interfere with a contract for economic reasons, but not where he is motivated by spite, malice, or some other improper objective.[4]

---

**2.** The seven factors are:
  (a) the nature of the actor's conduct,
  (b) the actor's motive,
  (c) the interests of the other with which the actor's conduct interferes,
  (d) the interests sought to be advanced by the actor,
  (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
  (f) the proximity or remoteness of the actor's conduct to the interference and
  (g) the relations between the parties.
RESTATEMENT (SECOND) OF TORTS § 767.

**3.** As Prosser puts it, these factors are "no doubt all appropriate enough but not a list that would inspire one to predict an outcome, or decide one's rights or duties." *Prosser, supra*, at 984 n. 63.

**4.** Many commentators have noted the pervasive vagueness of the intentional interference tort.

See, e.g., Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 61 (1982) ("The absence of a coherent doctrine is understandable. The idea that a person should not interfere with another's economic relationships is easier to expound in the abstract than to apply in the particular."). Further, they observe that the tort seems to cover without discernable limiting principles much conduct which in our competitive society seems distinctly valuable. Perlman, *supra*, at 83 (While contract law facilitates efficiency gains derived from a breach of contract, interference torts seem "designed to reduce the number of such breaches and thus run[ ] counter to a plausible objective of contract doctrine."); Dobbs, *Tortious Interference with Contractual Relationship*, 34 Ark.L.Rev. 335, 343 (1980) ("Liability is imposed for acts permissible in themselves—honest representations, for example—and imper-

Our conclusion is that, where there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.

*Id.* at 31.

■ In our view, this rule applies to this case. Although the defendant in *Bendix* was a corporation which forced its subsidiary to breach a contract with the plaintiff, we recognized that another economic interest which would support a claim of privilege was the interest which a lessor had "in his property to interfere in a sublease." *Id.* (citing *Bergfeld v. Stork*, 7 Ill.App.3d 486, 288 N.E.2d 15 (1972)).

A number of other cases have recognized that a landlord has a sufficient interest to interfere with a prospective or actual lease assignment. *Toys "R" Us, Inc. v. NBD Trust Co. of Illinois*, 904 F.2d 1172, 1178 (7th Cir.1990) (recognizing privilege where lessor wished to maintain control over appearance and character of shopping center); *Walner v. Baskin–Robbins Ice Cream Co.*, 514 F.Supp. 1028 (N.D.Tex. 1981). The right to intervene has also been recognized in the analogous setting of transfers of distributorships. *Genet Co. v. Annheuser–Busch, Inc.*, 498 So.2d 683, 684 (Fla.App.1986) ("[A] cause of action for tortious interference does not exist against one who is himself a party to the business relationship allegedly interfered with.");

*Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wash.App. 1, 776 P.2d 721 (1989).

It seems beyond reasonable argument that an owner of property has a financial interest in the assignment of a lease of the property he owns. An effective lease assignment makes the assignee the tenant of the owner; the assignee becomes the lessee and has a direct contractual relationship with the owner. *See generally* R. Cunningham, W. Stoebuck & D. Whitman, *The Law of Property* § 12.40, at 898–99 (Lawyers ed. 1984). The tenant also has an obligation to pay rent directly to the owner, and the use, or abuse, of the property by the assignee may affect its value to the owner. Further, the owner may know of another potential assignee who will pay more rent than the prospective assignee. Moreover, the owner may wish to terminate the lease based on knowledge of a more profitable use for the property. If so, the owner is obviously financially interested in a proposed assignment as the assignor may consent to the termination of the lease while the proposed assignee might not.

For the above reasons, we conclude that the *Bendix* formulation of privilege applies to an owner-landlord who interferes with his tenant's lease assignment contract. Since Hudesman had a direct financial interest in the proposed assignment of the lease, "the essential question in determining if interference is justified is whether [Hudesman's] conduct is motivated by a

missible only because the defendant's purpose is thought insufficiently laudable. Indeed, the act involved in these cases is often the act of speech, the most protected of all social acts."); *Prosser, supra,* § 130 (interference with prospective advantage). *But see* Loewenstein, *Tender Offer Litigation and State Law,* 63 N.C.L.Rev. 493 (1985) (finding tort of interference with prospective economic advantage effective in controlling abuses in tender offers).

Because of these concerns, the Supreme Court of Oregon has held that where the defendant does not purposefully act to harm the plaintiff, the tort should be limited to where the interference is independently wrongful in the sense of a tort or a breach of some statutory or regulatory duty "'beyond the fact of the interference itself.'" *Straube v. Larson,* 287 Or. 357, 600 P.2d 371, 374 (1979) (quoting *Top Service Body Shop,*

*Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365, 1371 (1978)); *Lewis v. Oregon Beauty Supply Co.,* 302 Or. 616, 733 P.2d 430, 434 (1987). This result has been endorsed by a number of commentators. Perlman, *supra;* Dobbs, *supra.* Perlman suggests "an unlawful means test that restricts tort liability to those cases in which the defendant's act is independently wrongful." Perlman, *supra,* at 62. Such an approach provides a clearer rule on which potential plaintiffs and defendants can rely in evaluating conduct.

These observations suffice to counsel caution in the application of the interference tort to new fact situations. The Oregon rule may be desireable. However, it is not necessary to decide whether it should be adopted at present because the direct financial interest privilege which we adopted in *Bendix* applies to this case.

desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective." *Bendix*, 610 P.2d at 31. As there is no evidence of spite, malice or other improper objective—Hudesman did not even know RAN Corporation's principals—and since it is clear that Hudesman refused to approve the assignment because he believed that he would receive a greater economic benefit from a tenancy by Reinwand, the interference was justified and summary judgment was properly entered.

Hudesman's threat of litigation does not seem relevant to RAN's claim for intentional interference. RAN's assignment agreement with Harris was explicitly conditional on Hudesman's approval. When Hudesman disapproved of the assignment the interference was complete. Hudesman's disapproval may have been a breach of the Hudesman/Harris lease, but it was privileged from a tort standpoint because of Hudesman's pre-existing interest as a property owner/lessor. The threat of litigation may, at worst, have been another breach of the Hudesman/Harris lease. However, it too was not tortious[5] and it was, in any case, superfluous to the interference, because RAN's prospective economic relationship was terminated by Hudesman's disapproval, not by his threat to sue.

For the reasons above we AFFIRM the judgment of the superior court.

BURKE, Justice, dissenting.

I respectfully dissent.

We once observed that "[b]ona fide competition for customers ... not only is allowable, but is fundamental to our economic system." *Ellis v. City of Valdez*, 686 P.2d 700, 707 n. 14 (Alaska 1984). Thus, we have held that one may be privileged to interfere with another's contract when the actor has a direct financial interest in the contract. *Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980). In determining the question of privilege, however, "the essential question ... is whether the person's conduct is motivated by a desire to protect [the person's] economic interest, or whether it is motivated by spite, malice, or some other improper objective." *Id.* at 31.[1]

One is privileged to interfere with another's contractual interests only when acting to promote the interest of oneself, others, or the public, *and only if the interest promoted by the invasion is superior in social importance to the interest invaded.* See *Alyeska Pipeline Service Co. v. Aurora Air Service, Inc.*, 604 P.2d 1090, 1094 (Alaska 1979); *see also* 2 F. Harper, F. James & O. Gray, *The Law of Torts* § 6.12, at 350 (2d ed. 1986). Moreover, few privileges are sufficiently well recognized to support their application as a matter of law:

> [R]ecurrent factual patterns may have developed, reflecting identifiable standards of business ethics or recognized community customs as to acceptable conduct and leading the court to feel that the determination of whether the interference was improper should be made as a matter of law.... [But] when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.

Restatement (Second) of Torts § 767 comment *l*, at 39 (1979).

In the case at bar, the record provides no reasonable assurance that Smith and Hudesman interfered in the assignment

---

**5.** The threat may have been a breach of the covenant of good faith and fair dealing which is implied in all contracts. A breach of the covenant is not tortious and does not give rise to a cause of action in favor of a third party. *O.K. Lumber Co. v. Providence Washington Ins. Co.*, 759 P.2d 523, 525–26 (Alaska 1988).

**1.** There is nothing in the record which indicates that Smith and Hudesman caused the termi-

nation of the Harris–RAN contract because they wished to harm RAN. However, "[i]t has long been clear ... that 'malice' in the sense of ill-will or spite is not required for liability" in interference with contract or prospective business advantage actions. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 129, at 983 (5th ed. 1984); *Long v. Newby*, 488 P.2d 719, 722 (Alaska 1971).

contract in order to protect Hudesman's economic interest in the property. In fact, the record suggests that Smith and Hudesman were motivated to interfere in the assignment to RAN solely because they wanted to consummate a business deal with Reinwand. There was no direct economic reason to prefer either of the competing tenants; RAN and Reinwand proposed to use the property in nearly identical ways, and both agreed to pay precisely the same rent. Overall, it is quite apparent that it was Reinwand's interest in the property, not Hudesman's, that motivated Smith and Hudesman to interfere with the Harris–RAN assignment contract.

Also, the interest Smith and Hudesman had in the contract differed greatly from the personal stake that formed the basis of the privilege that we applied as a matter of law in *Bendix*. When Smith and Hudesman threatened Harris with litigation if he "pushed" RAN as his assignee, they did so free of any real economic concern. They stood to lose nothing by forcing Harris to relinquish his right to assign his lease to the person of his choice.

Opposite RAN's conditional interest in the assignment contract stands the interest Smith and Hudesman had in furthering Hudesman's business connections.[2] In evaluating the relative social importance of these two interests, we consider factors such as "the nature of the actor's conduct," Restatement (Second) of Torts § 767(a), at 26 (1979), and "the social interests in protecting the freedom of action of the actor and the contractual interests of the other." *Id.* § 767(e), at 27. When these factors are considered, I think the proper disposition of this case becomes obvious.

Society's interest in protecting contractual rights such as RAN's is certainly important, despite the conditional nature of that right. In contrast, there is *no* societal interest in protecting conduct which includes threats of litigation such as those made by Smith and Hudesman in the instant case. In particular, Hudesman's agent, Smith, threatened Harris with litigation in order to dissuade him from exercising his right to assign his lease rights to RAN.[3] Relative to this subject, the Restatement has this to say:

> Litigation and the threat of litigation are powerful weapons. When wrongfully instituted, litigation entails harmful consequences to the public interest in judicial

---

**2.** Hudesman, as owner, probably had a strong interest in any contract that affected his property. But, as lessor, he had relinquished to Harris much of his right in the property. For example, although Hudesman retained the right to exercise reasonable approval prerogative over the assignment to RAN, he simultaneously lost his right to deny approval merely because he preferred to have some other tenant take possession of the property. *See Hendrickson v. Freericks,* 620 P.2d 205, 211 (Alaska 1980) (if lessor's consent is required for assignment, lessor may withhold consent only with reasonable grounds). Thus, just as the conditional nature of its contract weakened RAN's interest, so did the lease weaken Hudesman's interest. Even assuming, then, that Smith and Hudesman acted, in part, for the purpose of protecting Hudesman's interest in the property, the relative social importance of that interest does not by itself render RAN's conditional interest unworthy of protection. Additionally, it is important to underscore the distinction between an interest in a contract and an action undertaken for the purpose of protecting that interest. Smith and Hudesman must show the latter in order to prove that their interference was privileged.

**3.** The majority concludes that "the condition precedent in the proposed lease agreement between Harris and RAN ... fail[ed]" at some moment *before* Smith and Hudesman threatened Harris with litigation. As a result, the majority considers the threats of litigation "irrelevant." The majority first presumes to construct from the record the exact condition RAN and Harris had agreed to include in their contract, then presumes to find that its own version of the condition "failed." Such fact finding by this court ranges well beyond the review of the record that is appropriate in an appeal from a grant of summary judgment. Moreover, even on its own version of the facts, the court's conclusion that Hudesman's "disapproval" unilaterally terminated RAN's contract seems suspect. A conditioned contractual duty is discharged when the condition becomes "impossible of performance." 3A A. Corbin, *Corbin on Contracts* § 630, at 20 (1960). At the earliest, Hudesman's approval became "impossible" to obtain only after Harris decided not to assert his rights to assign to the subtenant of *his* choice. We may reasonably infer that Hudesman's litigation threats coerced Harris not to resist Hudesman's disapproval of the assignment. Thus, the threats are essential to an evaluation of this case.

administration as well as to the actor's adversaries. The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication.

Restatement (Second) of Torts at § 767 comment c, at 30–31.

The evidence of threats made in the case at bar should temper any consideration we might otherwise give to the importance of Smith's and Hudesman's freedom to conduct business. A lawsuit instituted or threatened only to harass may constitute actionable interference with contractual relations, even if it has merit. *See, e.g., C.N.C. Chemical Corp. v. Pennwalt Corp.,* 690 F.Supp. 139, 143 (D.R.I.1988) (initiation of lawsuit "without probable cause and for the purpose of interfering with … contractual relations" constituted improper interference); *Nesler v. Fisher & Co.,* 452 N.W.2d 191, 198 (Iowa 1990). Consequently, we should be especially troubled by evidence in the record tending to show that Smith and Hudesman held *no* belief they had a meritorious claim to assert against Harris, or a claim that even arguably had merit. Such evidence easily supports the inference that Smith threatened Harris with litigation in utter bad faith for no other purpose than disrupting the Harris–RAN assignment contract. There is, of course, no societal interest to be served by

affording privileged status to such behavior.

The privilege we recognized in *Bendix* is indeed broad,[4] but not so broad as to encompass, as a matter of law, the conduct alleged here. The question in this case is whether Smith and Hudesman acted acceptably, given the current community standards and the manner in which business persons are expected to conduct their affairs. *See* Restatement (Second) of Torts § 767 comment *l* (1979). This is not a theoretical problem to be resolved by this court according to abstract notions of how society should work. Rather, this is a genuine issue of material fact. As such, it should be determined by the trier of fact, after thorough review of the evidence produced at trial. *See C.N.C. Chemical Corp.,* 690 F.Supp. at 143; *Powers v. Leno,* 24 Mass.App.Ct. 381, 509 N.E.2d 46, 49 (1987); *see also Snow v. Western Savings & Loan Ass'n,* 152 Ariz. 27, 730 P.2d 204 (1986).[5]

I would hold that the superior court erred in concluding, as a matter of law, that the conduct of Smith and Hudesman was privileged because such conduct was protective of a direct financial interest. I would reverse the judgment and remand the matter for trial.

---

**4.** Other courts have adopted a similar, but narrower privilege, limited only to cases involving the interference of parent corporations in their subsidiaries' contracts. *E.g., Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 702 F.2d 719, 722 (8th Cir.1983); *James M. King & Assoc. v. G.D. Van Wagenen Co.,* 717 F.Supp. 667, 681 (D.Minn.1989). Although the facts of *Bendix* involved only a parent corporation's interference with the contract of its subsidiary, we stated the direct financial interest privilege in very broad terms, and as a result the privilege logically could apply generally to cases in which the interferer has a direct stake in the contract interfered with. *See Bendix,* 610 P.2d at 29–31.

**5.** In *Snow,* a mortgagee threatened to invoke a due-on-sale clause in an attempt to interfere with the mortgagor's contract to sell the mortgaged property. *Snow,* 730 P.2d at 206–07. The Arizona Supreme Court reversed a grant of summary judgment for the mortgagee and remanded for the trier of fact to determine whether the threats to invoke the due-on-sale clause were made in good faith *and* to determine whether the mortgagee truly had acted to protect any of its interests related to the sale of the mortgaged property. *Id.* at 213–14. Similar determinations should concern the trier of fact in this case. *See id.; see also Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 782 F.2d 781, 784 (8th Cir.1986).