**E.E. WALDROUP, D.C. d/b/a Chiropractic Health Clinic and HealthBeat of Alaska, Appellants,**

v.

**Melissa A. LINDMAN, and Allstate Insurance Company, Appellees.**

No. S-9409.

Supreme Court of Alaska.

Aug. 10, 2001.

---

**38.** *Rosson,* 727 P.2d at 767.

**39.** *Id.*

**40.** *See Disciplinary Matter Involving Frost,* 863 P.2d 843, 844 (Alaska 1993).

Richard G. Haggart and David W. Murrills, Law Offices of Richard G. Haggart, Anchorage, for Appellants.

Barry J. Kell and Audrey H. Faulkner, Wilkerson & Associates, Anchorage, for Appellees.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. *INTRODUCTION*

The insurer of a chiropractor's patient denied payment for treatment the insurer considered unreasonable and unnecessary. It offered to defend the patient if the chiropractor sued her for payment. The chiro-

practor sued the insurer, alleging interference with contractual relations. Was it error to grant summary judgment to the insurer on that claim? Because the insurer had a direct financial interest in the contractual relationship between its insured and the chiropractor, and because there was insufficient evidence to raise a genuine issue of material fact to support a claim that an improper purpose motivated the insurer, we hold that any interference by the insurer was privileged as a matter of law. We therefore affirm the grant of summary judgment.

## II. *FACTS AND PROCEEDINGS*

On February 15, 1995 a vehicle rear-ended an automobile in which Melissa Lindman was a passenger. Lindman was insured under an Allstate Insurance Company automobile insurance policy which provided for payments for "all reasonable expenses incurred for necessary treatment actually rendered within one year of [an] accident because of [a] bodily injury."

Lindman went the next day to the Chiropractic Health Clinic, the clinic of E.E. Waldroup, Doctor of Chiropractic. Lindman complained of back and neck pain and headaches.

Before Dr. Waldroup examined her, Lindman completed and signed a patient intake form, which provided:

I understand and agree that health and accident insurance policies are an arrangement between an insurance carrier and myself. Furthermore, I understand that the Chiropractic Health Clinic will prepare any necessary reports and forms to assist me in making collection from the insurance company and that any amount authorized to be paid directly to the Chiropractic Health Clinic will be credited to my account on receipt. However, I clearly understand and agree that all services rendered me are charged directly to me and that I am personally responsible for payment. I also understand that, if I suspend or terminate my care and treatment, any fees for professional services rendered me will be immediately due and payable.

Lindman also signed a personal injury office policy form containing similar language.

Dr. Waldroup administered chiropractic care to Lindman at the clinic between February and May 1995.[1] In June Dr. Waldroup referred Lindman to HealthBeat of Alaska, a physical rehabilitation clinic owned by Dr. Waldroup. Lindman again completed and signed a patient intake form and a personal injury office policy form. She also signed a doctor's lien form, which provided:

I fully understand that I am directly and fully responsible to said doctor for all physical rehabilitation bills submitted by him for service rendered me, and that this agreement is made solely for said doctor's additional protection and in consideration of his awaiting payment. And I further understand that such payment is not contingent on any settlement, claim judgment or verdict by which I may eventually recover said fee.

Dr. Waldroup treated Lindman at HealthBeat of Alaska until December 1995. On December 8, 1995 Allstate, acting as Lindman's insurer, informed Dr. Waldroup in writing that it would deny payment for any treatment Dr. Waldroup rendered at HealthBeat of Alaska after June 30, 1995, unless Dr. Waldroup submitted "additional objective documentation" supporting the treatment as "reasonable, necessary and accident related." Allstate also wrote Lindman on the same date. This letter advised Lindman of its decision to deny payment for the treatment and assured her that "if Allstate denies payment of these bills as not being reasonable and necessary treatment we will defend you if Chiropractic Health Clinic and/or HealthBeat of Alaska pursues you for payment."

In May 1996 Dr. Waldroup demanded payment from Lindman. Lindman refused to pay.

In November 1997 Dr. Waldroup sued Lindman and Allstate in superior court. By amended complaint, Dr. Waldroup and HealthBeat of Alaska (collectively "Waldroup") alleged breach of contract and breach of the covenant of good faith and fair

---

1. Lindman received no treatments between February 20, 1995, and April 24, 1995, because she was in Mississippi for Air National Guard training.

dealing against Lindman; they alleged interference with contractual relations and intentional/malicious conduct against Allstate.

In October 1998 Allstate and Lindman moved to amend their answer to assert the affirmative defenses of breach of contract and breach of fiduciary obligations. Dr. Waldroup opposed that motion and cross-moved to strike the affirmative defense of unclean hands. The superior court granted the defendants' motion to amend their answer. The superior court's order did not address Dr. Waldroup's cross-motion.

In May 1999 Dr. Waldroup asked the superior court to appoint an expert advisory panel under AS 09.55.536 and Alaska Civil Rule 72.1 to evaluate defendants' affirmative defenses. The superior court denied this request.

Allstate had previously moved for summary judgment on Dr. Waldroup's claim for interference with contractual relations. The superior court granted Allstate's motion in August 1999 and entered a Civil Rule 54(b) final judgment for Allstate.[2]

In October 1999 the parties agreed to submit Dr. Waldroup's claims for breach of contract and breach of the covenant of good faith and fair dealing to arbitration, with the superior court retaining jurisdiction as to any legal issues arising from the arbitration.

Dr. Waldroup appeals the superior court's orders (1) granting summary judgment on Dr. Waldroup's claim for interference with contractual relations; (2) granting Allstate and Lindman leave to amend their answer; and (3) denying Dr. Waldroup's request to appoint an expert advisory panel.

## III. DISCUSSION

### A. Standard of Review

■ We review a grant of summary judgment de novo and affirm if the evidence in the record fails to disclose a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.[3] We view the facts in the light most favorable to the non-moving party.[4] We apply our independent judgment to any questions of law, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[5]

### B. It Was Not Error to Grant Summary Judgment on Dr. Waldroup's Claim for Interference with Contractual Relations.

The superior court dismissed Dr. Waldroup's interference-with-contractual-relations claim on summary judgment, finding as a matter of law that any interference by Allstate was privileged. On appeal, Dr. Waldroup argues that it was error to grant summary judgment because he claims: (1) Allstate did not have a "direct financial interest" in the contractual relationship between Dr. Waldroup and Lindman; (2) genuine issues of material fact regarding Allstate's motivation precluded summary judgment; (3) Allstate's interference "pervade[d] the entire physician-patient relationship and not merely that part of it relating to Allstate's interest in the automobile accident"; and (4) public policy dictates against granting insurance companies a privilege to interfere with the physician-patient relationship.

■ The tort of intentional interference with contractual relations requires proof that " '(1) a contract existed, (2) the defendant knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified.' " [6] Allstate

---

**2.** Although Allstate did not move for summary judgment on Dr. Waldroup's claim for intentional/malicious conduct, Dr. Waldroup's brief concedes that the superior court's grant of summary judgment on the interference-with-contractual-relations claim also effectively precluded a claim for intentional/malicious conduct, because the court's conclusion that Allstate's conduct was privileged as a matter of law precluded a finding that the same conduct was intentionally or maliciously tortious.

**3.** See Mathis v. Sauser, 942 P.2d 1117, 1120 (Alaska 1997).

**4.** See id.

**5.** See id.

**6.** RAN Corp. v. Hudesman, 823 P.2d 646, 648 (Alaska 1991) (quoting Knight v. American Guard & Alert, Inc., 714 P.2d 788, 793 (Alaska 1986)) (internal ellipses omitted).

conceded for purposes of its summary judgment motion that there was sufficient evidence of the first five elements to preclude dismissal of Dr. Waldroup's claim on summary judgment. Allstate's motion and Dr. Waldroup's response focused on the sixth element of the tort—whether Allstate's conduct was privileged or justified.

In *RAN Corp. v. Hudesman*, we held that "where an actor has a direct financial interest, he [or she] is privileged to interfere with a contract for economic reasons, but not where he [or she] is motivated by spite, malice, or some other improper objective." [7] We added that " 'where there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.' " [8]

### 1. *Allstate had a direct financial interest in the contractual relationship between Dr. Waldroup and Lindman.*

■ The superior court found as a matter of law that "Allstate [had] a direct financial interest in the contract between Dr. Waldroup and Ms. Lindman, as to medical care related to the subject automobile accident." Dr. Waldroup argues on appeal that Allstate did not have a "direct financial interest" in the contractual relationship between himself and Lindman, because Allstate's interference did not expose it to *both* potential gain *and* loss.

In *Bendix Corp. v. Adams*, we considered whether a parent corporation was privileged to interfere with a contractual relationship of its subsidiary.[9] We held that "where a direct interest in a contract is involved, there is reason to be more liberal in granting the privilege to interfere with an existing contract." [10] We explained:

There appears to be a significant distinction ... between the interests of a person

in his [or her] competitor's contracts and those contracts in which he [or she] has some direct financial interest. One who interferes with a competitor's contracts ordinarily has little to lose and much to gain by successfully causing a breach of contract. Encouraging contractual stability may require imposing legal liability to stop such behavior when it steps beyond limits acceptable to society. But in a case where a person has some direct financial stake in a contract, it appears logical that a person's own economic self-interest would discourage causing a breach of contract because there would be some personal loss. For example, it seems that a stockholder in a closely held corporation would not ordinarily want to interfere in the corporation's contracts because the corporation would become liable for breach of contract, jeopardizing the value of the stockholder's own investment.[11]

Citing *Bendix*, Dr. Waldroup contends that to find that a defendant has a "direct financial interest" in the contractual relationship of a plaintiff alleging interference with contractual relations, the defendant must be exposed to both potential gain and loss as a result of its interference. Because "Allstate could *gain* by interfering in the Lindman-Waldroup contract [but] could not lose anything Allstate was not already obligated to provide to Lindman," Dr. Waldroup argues that Allstate did not have a "direct financial interest" in the contractual relationship between Lindman and Dr. Waldroup. We disagree.

■ We do not read *Bendix* to hold that a finding of a "direct financial interest" in a contractual relationship *requires* that an interfering defendant must be exposed to both potential gain and loss as a result of its interference.[12] Rather, exposure to both gain and loss is a factor that courts consider in determining whether a defendant has a "direct financial interest" in a contractual rela-

---

7.  823 P.2d 646, 648 (Alaska 1991).

8.  *Id.* at 649 (quoting *Bendix Corp. v. Adams*, 610 P.2d 24, 31 (Alaska 1980)).

9.  610 P.2d 24, 25-32 (Alaska 1980).

10.  *Id.* at 30.

11.  *Id.* (emphasis added).

12.  *See id.* at 29-32.

tionship.[13] As we noted in *Bendix*, "[o]ne who interferes with a competitor's contracts ordinarily has little to lose and much to gain by successfully causing a breach of contract. Encouraging contractual stability *may* require imposing legal liability to stop such behavior *when it steps beyond limits acceptable to society.*" [14] "[T]he essential question in determining if interference is justified is whether the [defendant's] conduct is motivated by a desire to protect [its] economic interest, or whether it is motivated by spite, malice, or some other improper objective." [15] Thus, in cases in which a defendant's interference exposes it to potential gain but not loss, the interference may nevertheless be privileged if it does not step beyond limits acceptable to society—i.e., if it is not motivated by spite, malice, or some other improper objective.[16]

For example, we held in *RAN* that a landlord had a direct financial interest in a lessee's proposed assignment of a lease because: (1) "[a]n effective lease assignment makes the assignee the tenant of the owner; the assignee becomes the lessee and has a direct contractual relationship with the owner"; [17] (2) "[t]he tenant also has an obligation to pay rent directly to the owner, and the use, or abuse, of the property by the assignee may affect its value to the owner"; [18] (3) "the owner may know of another potential assignee who will pay more rent than the prospective assignee"; [19] and (4) "the owner may wish to terminate the lease based on knowledge of a more profitable use for the property." [20] We did not discuss whether the landlord's interference also exposed him to potential loss.[21] Because there was "no evidence of spite, malice or other improper objective," [22] we concluded that the landlord

was privileged to interfere with his tenant's lease assignment contract.[23]

In any event, Allstate's alleged interference with the contractual relationship between Lindman and Dr. Waldroup subjected it to both potential gain and loss. Dr. Waldroup concedes that Allstate could potentially gain by interfering with the contract between Lindman and Dr. Waldroup: "Allstate's interference in the contract between Dr. Waldroup and Lindman ... could result in Allstate paying *less* than it would otherwise be required to pay under its insurance contract with Lindman." Lindman's auto insurance policy with Allstate obligated "Allstate [to] pay to or on behalf of a person insured all reasonable expenses incurred for necessary treatment actually rendered within one year of [an] accident because of [a] bodily injury." By interfering, Allstate could potentially gain because Dr. Waldroup might decide not to pursue legal action given the dollar amount in question and the cost of litigation, or might settle for less than the full amount Lindman owed.

Allstate's alleged interference also exposed it to potential loss. Allstate's letter promised to defend Lindman in any action filed by the clinic or HealthBeat of Alaska, even though its insurance policy did not clearly require it to do so. Thus, by interfering with the contractual relationship, Allstate was prospectively exposed to the cost of defending Lindman if Dr. Waldroup sued her for payment.

Dr. Waldroup also cites *Speer v. Cimosz*, in which the Court of Appeals of New Mexico upheld a jury verdict against a workers' compensation insurer for interference with contractual relations.[24] In *Speer*, a workers' com-

---

13. *See id.*

14. *Id.* at 30 (emphasis added).

15. *Id.* at 31. We address Dr. Waldroup's arguments regarding Allstate's allegedly improper motivation in Part III.B.2.

16. *See id.*

17. *RAN Corp.*, 823 P.2d at 649.

18. *Id.*

19. *Id.*

20. *Id.*

21. *See id.* at 647-50. *But see id.* at 651 (Burke, J., dissenting) ("[The landlord] stood to lose nothing by forcing [its tenant] to relinquish his right to assign his lease to the ·person of his choice.").

22. *Id.* at 650.

23. *See id.*

24. 97 N.M. 602, 642 P.2d 205, 207 (App.1982).

pensation insurer had denied payment to a chiropractor for treatment it considered unreasonable and had assured its insureds that " 'in the event suit is filed against you, the company will provide a complete defense of any action....' " [25] On appeal, the insurer argued that the trial court had erred by denying its motion for a directed verdict.[26] But the court of appeals held that "the evidence [at trial] sustained the claim of interference and the jury was not erroneously instructed thereon." [27] Dr. Waldroup argues that *Speer* necessarily implies that an insurer is not privileged to interfere with its insured's contractual relationship with a healthcare provider.

But *Speer* is distinguishable. The court there defined "privilege" as "a good faith assertion or threat by the one interfering to protect a legally-protected interest of his [or her] own which he [or she] believes might otherwise be impaired or destroyed by performance of the contract." [28] The court then held that the insurer's argument that it would have lost the "right" to pay its insureds' medical bills if it did not inject itself into the contracts between its insureds and the chiropractor was " 'full of sound and fury, signifying nothing.' " [29] The court's definition of privilege did not turn on whether the defendant had a "direct financial interest" in the plaintiff's contractual relationship.[30] Dr. Waldroup's reliance on *Speer* is therefore misplaced.

The terms of Allstate's insurance policy with Lindman and evidence of Lindman's February 1995 automobile accident made out a prima facie case for summary judgment on the issue of Allstate's "direct financial interest" in the contractual relationship between Dr. Waldroup and Lindman. Because Dr. Waldroup did not raise a genuine fact dispute regarding Allstate's "direct financial inter-

est," we affirm the grant of summary judgment on this issue.

2. *No genuine issues of material fact regarding Allstate's motivation precluded summary judgment.*

Dr. Waldroup next argues that even if Allstate had a "direct financial interest" in the contractual relationship between Dr. Waldroup and Lindman, it was nevertheless error to dismiss the interference-with-contractual-relations claim on summary judgment, because the question whether Allstate's interference was improperly motivated is one for the trier of fact. Dr. Waldroup cites *Geolar, Inc. v. Gilbert/Commonwealth Inc.*, where we held that the question whether a defendant's interference with a plaintiff's contractual relationship is motivated by an improper objective is normally one for the trier of fact.[31]

We note initially that Dr. Waldroup did not preserve the issue of improper motive in the superior court. Dr. Waldroup's opposition to Allstate's summary judgment motion did not address that issue. Nor did Dr. Waldroup file a statement of genuine issues of material fact regarding Allstate's motivation, as permitted by Alaska Civil Rule 56(c).[32] But in any event, we find Dr. Waldroup's argument unpersuasive.

Dr. Waldroup argues that the record before the superior court when it granted summary judgment contained sufficient evidence of Allstate's improper motivation to preclude summary judgment. Dr. Waldroup first asserts that the record contained evidence that "Allstate cut off payment as of June 30, 1995, but did not bother telling either Lindman or Dr. Waldroup that they were doing so until after the treatment regime had been completed." This assertion is inaccurate. Dr. Waldroup's deposition testimony establishes

---

**25.** *Id.*

**26.** *See id.*

**27.** *Id.* at 210.

**28.** *Id.* at 209 (citing *Williams v. Ashcraft,* 72 N.M. 120, 381 P.2d 55, 56 (1963)).

**29.** *See id.*

**30.** *See id.*

**31.** 874 P.2d 937, 941 (Alaska 1994).

**32.** Alaska R. Civ. P. 56(c) ("The adverse party ... may serve ... a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated....").

that during the physical rehabilitation phase of Lindman's treatment, he was aware, based on communications with an Allstate agent, that Allstate was going to deny payment for portions of Lindman's treatment.

Dr. Waldroup next asserts that the record included evidence that "Allstate told Lindman not to pay Dr. Waldroup and offered to pay for a defense" even though it had no contractual obligation to do so. It is true that Allstate offered to pay for Lindman's legal defense. But Dr. Waldroup cites no evidence that would support a finding that Allstate advised Lindman not to pay Dr. Waldroup. And Allstate's offer to pay for Lindman's legal defense, standing alone, is insufficient to give rise to an inference of improper purpose. That offer arguably tends to establish the element of Allstate's wrongful conduct in inducing a contract breach by Lindman, but it sheds no light on Allstate's motivation for its conduct. Therefore, evidence of Allstate's offer to pay for Lindman's legal defense did not raise a genuine factual dispute material to the improper motivation issue.

Finally, Dr. Waldroup argues that summary judgment was precluded by evidence that "it was not until after this lawsuit was filed[ ] that Allstate hired an expert to try to find fault with Dr. Waldroup's treatment." First, this assertion is inaccurate. A letter dated October 10, 1995, prepared by a chiropractor at ADP/National Biosystems, Inc., establishes that Allstate consulted an expert regarding Dr. Waldroup's treatment of Lindman about ten months before Dr. Waldroup filed suit. Moreover, Dr. Waldroup does not explain how any delay in consulting with an expert would tend to prove an improper motive.

Did Allstate present sufficient evidence to make out a prima facie showing of entitlement to summary judgment on the issue of improper motive? [33] Although Allstate did not support its summary judgment motion with an affidavit addressing the issue, the record contained enough circumstantial evidence of good faith to satisfy Allstate's initial burden. First, evidence of Allstate's direct financial interest in the contractual relationship between Lindman and Dr. Waldroup [34] is circumstantial evidence of good faith, because business firms generally act in accordance with their financial interest. Furthermore, Dr. Waldroup testified in a deposition that he "actually . . . had a pretty good working relationship with Allstate." Finally, Allstate's December 1995 letter to Lindman was narrowly tailored to the exact nature of its dispute with Dr. Waldroup and did not reflect any improper motivation. That letter merely advised Lindman of Allstate's decision to deny payment for the treatment it claimed was unnecessary and unreasonable, and assured Lindman that "if Allstate denies payment of these bills as not being reasonable and necessary treatment we will defend you if Chiropractic Health Clinic and/or HealthBeat of Alaska pursues you for payment." Because Allstate made out a prima facie case for summary judgment on the issue of improper motive, and because Dr. Waldroup countered with no contrary evidence on that issue, we affirm the grant of summary of judgment on this issue.

### 3. Dr. Waldroup did not present evidence of treatment for reasons independent of Lindman's automobile accident.

Dr. Waldroup argued in the superior court, and maintains on appeal, that to the extent Lindman's need for treatment was independent of Lindman's automobile accident, Allstate did not have a "direct financial interest" in the physician-patient relationship. The superior court's order granting Allstate's motion for summary judgment noted that Dr. Waldroup had failed to present evidence raising a genuine issue of material fact about whether "the medical care involved in the collection suit [was] from some other cause."

Dr. Waldroup argues on appeal that evidence of Lindman's preexisting back and neck injuries raised a genuine factual dispute regarding the scope of Allstate's "direct fi-

---

**33.** *See Cannone v. Noey,* 867 P.2d 797, 801 n. 4 (Alaska 1994) ("A summary judgment movant bears the burden of demonstrating the absence of any genuine issue of material fact and entitlement to judgment as a matter of law.").

**34.** *See supra* Part III.B.1.

nancial interest" in the contractual relationship between Lindman and Dr. Waldroup. Dr. Waldroup therefore concludes that it was error to grant summary judgment. We disagree.

Although the record before the superior court contained evidence of Lindman's preexisting injuries, it contained no evidence that Lindman's treatment in 1995 was related to her preexisting injuries. Indeed, even Dr. Waldroup's affidavit did not aver that Lindman's treatment in 1995 was related to her preexisting injuries. We therefore hold that there was no genuine fact dispute regarding the scope of Allstate's "direct financial interest" precluding the summary judgment.

4. *Public policy considerations do not dictate against granting insurers a privilege to interfere with the physician-patient relationship.*

Dr. Waldroup also argues that public policy considerations dictate against granting insurance companies a privilege to interfere with the physician-patient relationship:

> If Allstate's actions herein are upheld as permissible as a matter of law, an open invitation is extended to medical insurers generally to utilize their economic power to influence and control the physician/[p]atient relationship for monetary, rather than medical reasons—all to the potential detriment of the health of their fiduciaries, the insureds.

Allstate responds:

> The typical health care consumer lacks any real degree of sophistication with respect to medical treatment, billing, and insurance; patients generally obtain the treatment their physicians prescribe, and rely on their insurers to pay for that treatment. Where, as here, a dispute arises as to the reasonableness of medical treatment, the insurer plays an important role in assuring the medical care providers do not seek to take advantage of patients.

Because we are not convinced that Dr. Waldroup's public policy argument, unsupported by evidence, is more plausible than Allstate's, we choose not to rely upon the parties' irreconcilable public policy arguments in deciding this case.

C. *It Was Not Error to Grant Allstate and Lindman's Motion to Amend Their Answer.*

In October 1998 Allstate and Lindman moved to amend their answer to assert the affirmative defenses of breach of contract and breach of fiduciary obligations. Dr. Waldroup opposed the motion and cross-moved to strike the affirmative defense of unclean hands. Dr. Waldroup argued that all three affirmative defenses were "simply disguised counterclaims for malpractice, and should have been asserted in that manner." The superior court granted Allstate and Lindman's motion to amend their answer. The superior court's order did not address Dr. Waldroup's cross-motion. It was therefore denied by implication. Dr. Waldroup appeals this ruling.

Dr. Waldroup's argument is not properly before us. The superior court's order granting Allstate and Lindman leave to amend their answer, the order from which Dr. Waldroup appeals, permitted Allstate and Lindman to plead affirmative defenses to Dr. Waldroup's contract claims. But the superior court has not entered final judgment as to those claims. Rather, the parties agreed to submit the contract claims to arbitration, with the superior court retaining jurisdiction as to legal issues arising from the arbitration. Because Alaska Appellate Rule 202(a) requires that appeals to the supreme court be taken from a final judgment entered by the superior court,[35] we lack jurisdiction to consider this issue. But because the parties have fully briefed this issue, we choose to treat it as if it were raised by a petition for review and review its merits to avoid a possible future appeal on this issue.[36]

---

**35.** Alaska R. App. P. 202(a) ("An appeal may be taken to the supreme court from a final judgment entered by the superior court....").

**36.** *See* Alaska R. App. P. 402(b)(2) (providing that petition for review will be granted where an

"order or decision involves an important question of law on which there is substantial ground for difference of opinion, and an immediate review of the order or decision may materially advance the ultimate termination of the litiga-

Dr. Waldroup contends that the superior court erroneously allowed Allstate and Lindman to assert the affirmative defenses of breach of contract, breach of fiduciary obligation, and unclean hands, because, he argues, they are no longer recognized under Alaska common law in cases between a physician and a patient, and must be pleaded as a medical malpractice counterclaim. We disagree.

■ Dr. Waldroup cites *M.A. v. United States* for the proposition that a cause of action for breach of fiduciary obligations is no longer recognized in Alaska in cases between a physician and a patient and must be asserted as a medical malpractice claim under AS 09.55.540(a).[37] Dr. Waldroup misreads the holding of *M.A.* That case held that a physician's negligent failure to diagnose a pregnancy gave rise to a valid cause of action for medical malpractice under AS 09.55.540(a).[38] That holding was based in part on the fiduciary responsibility of physicians toward their patients.[39] But *M.A.* did not hold that a cause of action for breach of fiduciary obligations is no longer available in Alaska in cases filed by patients against physicians.[40]

■ Dr. Waldroup also cites cases holding that if an attorney has made the client no express promise, the client's malpractice action sounds in tort and the two-year statute of limitation applies.[41] Dr. Waldroup argues that these cases stand for the proposition that Alaska no longer recognizes "a breach of contract claim between doctor and patient

with respect to treatment rendered." Not only does Dr. Waldroup misread the holding of these cases, but these cases were overruled in *Lee Houston & Associates, Ltd. v. Racine*, which held that the two-year limitation period for personal injury actions does not apply to actions arising out of professional service relationships which primarily involve economic injury.[42]

■ Finally, Dr. Waldroup cites no authority to persuade us that the affirmative defense of unclean hands is not recognized under Alaska law in a contract action between a physician and a patient. We therefore affirm the order granting Allstate and Lindman leave to amend their answer.

D. *It Was Not Error to Deny Dr. Waldroup's Request for Appointment of an Expert Advisory Panel.*

■ Waldroup claims that the superior court erred by denying his request under AS 09.55.536 [43] and Alaska Civil Rule 72.1 [44] to appoint an expert advisory panel to evaluate the defendants' affirmative defenses. Because Dr. Waldroup's request arises out of his contract claims, and because there is no final judgment as to those claims, we lack jurisdiction to consider this issue on direct appeal.[45]

In any event, Dr. Waldroup's arguments lack merit. He argues that the affirmative defenses of breach of contract, breach of fiduciary obligations, and unclean hands are "simply disguised counterclaims for malpractice" which trigger the provisions in AS

tion"); *City of North Pole v. Zabek,* 934 P.2d 1292, 1296 (Alaska 1997) (holding that this court may treat appeal improperly brought from non-final judgment as petition for review).

37. 951 P.2d 851 (Alaska 1998).

38. *See id.* at 853-54.

39. *See id.*

40. *See id.*

41. *See, e.g., Jones v. Wadsworth,* 791 P.2d 1013 (Alaska 1990); *Van Horn Lodge, Inc. v. White,* 627 P.2d 641 (Alaska 1981), *overruled by Lee Houston & Assocs., Ltd. v. Racine,* 806 P.2d 848 (Alaska 1991).

42. 806 P.2d 848, 854-55 (Alaska 1991).

43. AS 09.55.536(a) provides:

In an action for damages *due to personal injury or death* based upon the provision of professional services by a health care provider, ... the court shall appoint ... a three-person expert advisory panel unless the court decides that an expert advisory opinion is not necessary for a decision in the case.
(Emphasis added.)

44. Alaska Civil Rule 72.1(a) provides: "Either party in a health care malpractice action subject to AS 09.55.536 may request that the court appoint an expert advisory panel to evaluate the claim."

45. *See supra* Part III.C.

09.55.536 and Rule 72.1 for appointing an expert advisory panel. But Rule 72.1(a) provides that "[e]ither party in a health care malpractice action *subject to AS 09.55.536* may request that the court appoint an expert advisory panel to evaluate the claim." (Emphasis added.) Alaska Statute 09.55.536 applies only to "an action for damages *due to personal injury or death* based upon the provision of professional services by a health care provider...." [46] Even if Allstate and Lindman's affirmative defenses are characterized as counterclaims for medical malpractice, they do not allege death or personal injury based on Dr. Waldroup's services. Alaska Statute 09.55.536 and Rule 72.1 therefore do not apply. The superior court properly denied Dr. Waldroup's request to appoint an expert advisory panel.

## IV. *CONCLUSION*

For these reasons, we AFFIRM the superior court's judgment in all respects.

---

**46.** AS 09.55.536(a) (emphasis added).